# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 28, 2003 Session Heard at Cookeville

## STATE OF TENNESSEE v. GONZALO MORAN GARCIA
**Appeal by permission from the Court of Criminal Appeals,**
**Criminal Court for Davidson County**
**No. 99-C-01760  Steve Dozier, Judge**

---

### No. M2000-01760-SC-R11-CD - Filed October 1, 2003

---

The defendant, Gonzalo M. Garcia, was convicted in the Criminal Court for Davidson County of possession of one thousand grams or more of methamphetamine with intent to deliver.  We granted this appeal to determine whether the evidence obtained as a result of the stop should have been suppressed.  After examining the facts and law relevant to the issues, we hold that the defendant's traffic stop was not based upon reasonable suspicion, in violation of the Fourth Amendment to the Federal Constitution and Article I, section 7 of the Tennessee Constitution.  We also hold that the evidence in this case must be suppressed because the defendant's consent to search his vehicle was not sufficiently attenuated from his unlawful detention.[1]

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part.

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., E. RILEY ANDERSON, and ADOLPHO A. BIRCH, JR., JJ. joined.  JANICE M. HOLDER, J. filed a dissenting opinion.

Richard M. McGee and James O. Martin, III, Nashville, Tennessee, for the appellant, Gonzalo Moran Garcia.

Wesley MacNeil Oliver, New Haven, Connecticut, for the amicus curiae, Tennessee Association of Criminal Defense Lawyers.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Daryl J. Brand, Associate Solicitor General; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

---

[1] Oral argument was heard in this case on May 28, 2003, in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

# FACTUAL BACKGROUND

At approximately 10:50 p.m. on May 9, 1999, the defendant, Gonzalo M. Garcia, was stopped in his vehicle by Officer Deborah Kohl of the Metropolitan Nashville ("Metro") Police Department while driving on Interstate Highway 24 in Nashville, Davidson County, Tennessee. During the traffic stop, Metro police officers seized 40.1 pounds, or approximately 18,200 grams, of methamphetamine. On September 24, 1999, a Davidson County Grand Jury issued an indictment charging the defendant with one count of possession of one thousand grams or more of methamphetamine with intent to deliver. Prior to trial, the defendant filed a motion to suppress any evidence obtained as a result of the traffic stop. The trial court denied the motion, and the Court of Criminal Appeals upheld that ruling. We granted review in this case to determine whether the lower courts erred by refusing to suppress the evidence. Accordingly, our factual background will be limited to the relevant portions of the suppression hearing and the trial.

At the suppression hearing, Officer Kohl testified that she had been with the Nashville Police Department for eleven years and was currently assigned to the Twentieth Judicial District Drug Task Force and had been so assigned for approximately eight months before the traffic stop in this case. She also testified that she had received specialized training in the field of highway drug interdiction at conferences organized by the United States Custom Service and the Drug Enforcement Administration. Additionally, Officer Kohl stated that she had trained for a week in El Paso, Texas with the United States Custom Service and that she had attended other conferences on highway drug interdiction in Nashville and Memphis.

Officer Kohl testified that on the evening of the traffic stop in this case, she had just completed an unrelated traffic stop and began traveling east on Interstate Highways 40 and 24 in a marked police cruiser. While driving in the center eastbound lane, Kohl testified that as she began to overtake the defendant's car, which was in the far right lane, she noticed that the defendant's car "was swerving in its lane of traffic." She then pulled in behind the defendant's vehicle in order to observe its actions. Officer Kohl stated that vehicle's erratic behavior continued:

> The vehicle would drive in its lane -- it stayed in its lane of traffic; but, as the vehicle was going in its lane of traffic, it would swerve over to the right-hand marker, then it would swerve over to the left-lane marker.
>
> And I became concerned for his safety, as well as the safety of other motorists, and decided to stop the vehicle, at that point in time.

Among other possibilities, Officer Kohl stated that she suspected that the driver of the vehicle may have been intoxicated.

Upon stopping the defendant's vehicle, a white Pontiac Bonneville, Officer Kohl exited her vehicle and approached the defendant's vehicle on the passenger side. Upon reaching the passenger door, she motioned for the defendant to roll down the window, which he did. Because the defendant appeared puzzled when she identified herself as a Nashville Metro Police Officer, Officer Kohl

stated that she asked the defendant if he spoke Spanish, to which he replied, "Yes." Kohl then requested the defendant to exit the car and follow her to the rear of the vehicle. Officer Kohl told the defendant in Spanish: "I'm a police officer in Nashville, Tennessee. The reason I stopped you was for a moving violation. The moving violation was weaving." At that point, Kohl testified that the defendant replied, in English, "I was weaving." Because the defendant was responsive to English, the remainder of the conversation between Kohl and the defendant was in English.

After explaining to the defendant the reason he had been pulled over, Officer Kohl asked him if he had been drinking alcohol. The defendant answered no, and Kohl testified that the defendant's actions were not consistent with his being intoxicated. In fact, Kohl testified that two minutes into the traffic stop, she was satisfied that the defendant was not intoxicated. Moreover, she admitted that she did not witness the defendant speed, drive too slowly, cross any lanes of traffic, illegally pass another vehicle, follow too closely, commit a violation regarding use of the turning signal, or drive on the shoulder. After the defendant denied drinking alcohol, Kohl asked him if he was tired. The defendant explained to Kohl that he was tired because he had left Los Angeles, California, the day before and only briefly stopped at rest areas to sleep. Kohl asked the defendant about his destination, and he explained that he was traveling to Georgia. Kohl testified that the defendant gave inconsistent answers concerning who owned the vehicle and where he was going. However, the car was not stolen and the registration matched the vehicle. At the suppression hearing, Kohl could not recall whether the name on the vehicle registration was the same name that the defendant claimed was the owner. After obtaining the vehicle registration and the defendant's driver's license, Kohl asked the defendant about his driving record and arrest record. The defendant claimed that his driving record was "good," although he admitted that he had one arrest for driving under the influence.

After examining the defendant's license and vehicle registration, Kohl informed him that she was going to issue him a warning citation. Kohl advised the defendant that the warning citation would not carry a monetary fine, nor require him to come to court, nor affect his driving record. Kohl also gave the defendant directions to a location where he could park his vehicle and rest. She instructed the defendant to wait in his vehicle until she finished writing the citation. While retaining the defendant's license and registration, Kohl proceeded to her patrol car, where she radioed for a fellow officer to transport a drug-detection dog to the scene. Afterwards, Kohl prepared a warning citation for a violation of "lane restrictions," and also wrote out a "Consent to Search" form in Spanish before returning to the defendant's vehicle.

When Officer Kohl approached the defendant, she beckoned him to get back out of the vehicle. When he complied, Kohl returned to the defendant his driver's license, the vehicle registration, and the warning citation. After explaining to the defendant that when he was tired, he needed to take a coffee or sleep break, Officer Kohl thanked the defendant and told him, "The stop's complete." When the defendant began to walk towards his car, Officer Kohl turned as though to return to her vehicle. However, she promptly turned around and asked the defendant if she could ask him a few questions. When the defendant returned to Kohl's location at her direction, Kohl

asked him if he had any weapons or long-bladed knives in his vehicle.  The defendant replied, "No."  Kohl then asked the defendant if he had any illegal drugs in the vehicle.  Officer Kohl testified:

> At this point in time, his demeanor changed.  He gave me a -- a nervous, laughing, "No."  And he -- he became fidgety.  You could see him scratching on his back.  He was nervous and you could literally see his Adam['s] apple, a nervous sign, bobbing up and down, when I was talking to him, which, to me, is an indicator of some type of deception.

Officer Kohl then asked the defendant for permission to search his vehicle.  Kohl claimed that the defendant promptly invited Kohl to inspect the trunk.  Kohl declined and asked the defendant if he could read in Spanish.  When the defendant responded that he could read in Spanish, Kohl asked him to read the "Consent to Search" form that she had prepared.  She testified that "[a]s he read, you could follow his finger going along each sentence, which, to -- to me, demonstrated that he was actually reading the statement."  The consent form indicated that the defendant had the right to refuse consent, the right to limit consent to certain portions of the vehicle, as well as the right to revoke his consent at any time.  The defendant printed his name on the consent form and then signed it.

Subsequently, Officer Dean Hunter, who had arrived shortly beforehand, permitted his drug-detection dog, Lou, to smell around the vehicle.  The dog indicated that it detected the presence of illegal drugs on both the driver and passenger side of the vehicle.  Because the drug-detection dog indicated a positive response, Officers Kohl and Hunter began to search the vehicle while the defendant remained a short distance away with another police officer who had also arrived on the scene. Kohl recalled that while examining the interior of the vehicle, Officer Hunter noticed that the vehicle's rocker panels[2] had a fresh coat of paint that looked different than the paint on the rest of the vehicle. Officer Hunter removed the molding that covered the rocker panel and inserted a probe into the pre-existing screw holes.  Around one-half inch into the holes, he met some moderate resistance.  Hunter then inserted a drill into the holes, and the drill caused  some "white-terry-cloth material" to exit the holes.  Realizing that the cloth material should not be in the rocker panel, Kohl retrieved a "buster" or a density meter and measured the density of the rocker panels.  Kohl recalled: "I got a real high [density] rating, a reading of a sixty-eight which told me that there was something inside of [the rocker panel].  A normal reading should be, I would say probably, a twenty, twenty-five, something like that."

Following the high density reading, the officers drilled holes into the rocker panels, resulting in "a pinkish-brown-type material" exiting the drill bit.  Kohl testified that the officers tested the material for the presence of cocaine but received negative results.  Despite the negative result from the cocaine test, Kohl claimed that "we knew something was there that didn't belong there."  Thereafter, officers used a hammer to break the rocker panels open, where they found "duct-taped

---

[2]  A "rocker panel" is defined as "the portion of the body paneling of a vehicle that is situated below the doorsills of the passenger compartment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1965 (1993).

bundles" inside the rocker panels. Officer Kohl then placed the defendant under arrest. Laboratory testing revealed that the bundles contained 40.1 pounds, or approximately eighteen thousand grams, of methamphetamine.

At the conclusion of Officer Kohl's direct examination, the State introduced a video tape of Kohl's traffic stop of the defendant. The audio portion of the video tape is indiscernible. Kohl stated that after the traffic stop, she discovered the battery which powered the audio equipment was dead. Additionally, the State introduced into evidence, without objection, a certified copy of Metropolitan Nashville Code section 12.68.170, entitled "Careless driving." Section 12.68.170 provides:

> A. Every person operating a vehicle upon the streets within the metropolitan government, or any private road or driveway or parking area, shall drive the same in a careful and prudent manner, having regard for the width, grade, curves, corners, traffic and use of these streets and private areas, and all other attendant circumstances, so as not to endanger the life, limb or property of any person. Failure to drive in such manner shall constitute careless driving and a violation of this chapter.

At the close of the State's evidence, the defendant testified through an interpreter. The defendant's testimony at the suppression hearing was limited to establish his standing to contest the search of the vehicle which he was driving on May 9, 1999. Garcia claimed that the owner of the vehicle, Efrain Orosco, had given him permission to drive it while Orosco was away on vacation to Mexico. Moreover, the defendant claimed that Orosco knew that the defendant was planning a vacation to Georgia and had given him permission to drive the vehicle on his trip. Lastly, the defendant acknowledged that no one else had driven the vehicle within three days immediately prior to the traffic stop.

Following the hearing on the motion to suppress, the trial court denied the defendant's motion, concluding that the initial stop was based upon reasonable suspicion. The trial court further held that the initial search of the defendant's vehicle was based upon consent, and the more invasive search of the vehicle's rocker panels was based upon consent and also probable cause.

At trial, the State again presented the testimony of Officer Kohl. Though Officer Kohl's testimony was virtually identical to her testimony at the suppression hearing, she did relay some information that was not presented at the earlier hearing. For example, Kohl claimed that although she had conducted "several hundred" traffic stops while working with the Drug Task Force, only approximately ten resulted in seizures of some kind of narcotics. Kohl also testified that when she witnessed the defendant's vehicle swerving within its own lane, in addition to being concerned that the driver was potentially intoxicated, she was also concerned that perhaps the driver "was getting tired and maybe he's going to fall asleep at the wheel." Officer Kohl also testified that because the windows of the vehicle being driven by the defendant were tinted, she did not actually view the defendant until she had stopped the vehicle and spoke to the defendant from the passenger side of the vehicle.

Kohl testified that the interior of the vehicle was littered with various items including a gallon jug of water, soda cans, empty juice containers, and half-eaten sandwiches. In contrast to the defendant's claim that he was occasionally stopping at rest areas, Officer Kohl said she saw no blankets or pillows in the vehicle's interior. Kohl stated that the condition of the interior of the vehicle, combined with the defendant's inconsistent responses to her questions concerning his destination, indicated to her that perhaps the defendant was transporting narcotics. Based upon this suspicion, she radioed for a drug-detection dog handler and prepared a "Consent to Search" form.

Kohl testified that when she asked the defendant if he was carrying weapons or illegal drugs, the defendant became nervous and offered to let her examine the vehicle's trunk. Kohl claimed that the defendant's invitation to look into the trunk only increased her suspicion, "[I]n the past when I found drugs that weren't in the trunk, people always want you to look in the trunk. And, to me, they're trying to divert my attention away from where [the drugs] are [located]."

Conversely, at trial, the defendant testified, through an interpreter, that he did not state to Officer Kohl during the traffic stop that he did not know where he was going in Georgia. He also claimed that he did not tell Kohl that a cousin owned the vehicle that he was driving. Moreover, the defendant denied offering to let Kohl search the trunk. However, the defendant did testify that he consented in writing to the search with the full understanding that he could revoke his consent at any time.

At the conclusion of the trial, the jury found the defendant guilty of possession of one thousand grams or more of methamphetamine. The trial court sentenced the defendant to twenty years incarceration in the Tennessee Department of Correction.

On appeal, the Court of Criminal Appeals held that the initial traffic stop and Officer Kohl's continued detention of the defendant were not based upon reasonable suspicion and were in violation of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. However, the Court of Criminal Appeals held that the defendant freely and voluntarily consented to the search and, because the consent was sufficiently attenuated from the unlawful traffic stop, the exclusionary rule did not bar introduction of the seized methamphetamine. Ultimately, the Court of Criminal Appeals reversed the defendant's conviction and remanded the case for a new trial based upon the improper testimony of a Houston, Texas, police officer during trial. Thereafter, we granted the defendant permission to appeal on the following issue: whether the Court of Criminal Appeals erred by refusing to suppress evidence obtained as a result of the defendant's traffic stop.

For the reasons stated herein, we reverse that portion of the decision of the Court of Criminal Appeals finding the consent sufficiently attenuated from the illegal stop to render the search legal. Having thoroughly reviewed the record in this case and the applicable authorities, we hold that the initial stop and continued detention of the defendant in this case were not based upon reasonable suspicion of criminal activity and thus violated both the United States and Tennessee Constitutions. We also hold that the defendant's consent was not sufficiently attenuated from the unlawful stop; thus, the evidence seized in the defendant's traffic stop was fruit of the poisonous tree and should

-6-

have been excluded. Accordingly, the defendant's conviction is reversed, and this case is remanded to the Criminal Court for Davidson County for proceedings consistent with this opinion.

## STANDARD OF REVIEW

The instant case involves appellate review of a trial court's findings of fact and conclusions of law in denying a motion to suppress. The issue of whether reasonable suspicion existed to validate a traffic stop is a mixed question of fact and law. We review the factual determinations of a trial court under the standard articulated in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). In Odom, we held that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. Additionally, "[q]uestions regarding witness credibility and 'resolution of conflicts in the evidence are matters entrusted to the trial judge.'" State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (quoting Odom, 928 S.W.3d at 23).

In arguing that there was reasonable suspicion to validate the defendant's traffic stop in this case, the State argues that the Court of Criminal Appeals failed to give proper weight to the trial court's findings of fact by applying an erroneous standard of review. The State maintains that the Court of Criminal Appeals wrongly applied the standard of review to the findings of facts that we articulated in State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000), rather than the proper Odom "preponderance" standard. In Binette, we applied a *de novo* standard of review with no presumption of correctness to the trial court's findings of fact because the only evidence presented on behalf of the State at the suppression hearing was a videotape of the defendant's alleged driving errors. Id. Our rationale for so holding was that "when a trial court's findings of fact on a motion to suppress are based *solely* on evidence that does not involve issues of credibility, appellate courts are just as capable to review the evidence and draw their own conclusions." Id. (emphasis added).

In contrast to Binette, in the instant case the State presented the testimony of Officer Kohl in addition to the videotape of the circumstances that led to his traffic stop. Moreover, in its order denying the defendant's motion to suppress, the trial court specifically accredited Officer Kohl's testimony. Nevertheless, the Court of Criminal Appeals reviewed the trial court's findings of fact *de novo* claiming that "in [the trial court's] order denying the [defend]ant's motion to suppress, the trial court ultimately cites its own observations of the videotape recording in support of its determination of reasonable suspicion." Because the testimony of Officer Kohl involves issues of credibility, we will review the trial court's findings of fact under the Odom standard. In reviewing these findings of fact, we note that the testimony presented at trial may also "be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress." Walton, 41 S.W.3d at 81 (quoting State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1997)); State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

However, while we afford some deference to the trial court's findings of fact, the application of the law to those facts is a question of law which this Court reviews *de novo* with no presumption of correctness. State v. Yeargen, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Beare Co. v. Tennessee Dep't of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993)).

# ANALYSIS

## REASONABLE SUSPICION

The Fourth Amendment to the United States Constitution guarantees that "the right of the people to be secure . . . against unreasonable searches and seizures shall not be violated and no warrants shall issue, but upon probable cause."[3] Likewise, Article I, section 7 of the Tennessee Constitution guarantees "that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ." We have often noted that Article I, section 7 of our state constitution "is identical in intent and purpose with the Fourth Amendment." Binette, 33 S.W.3d at 218 (citing Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). Thus, the language of both the federal and state constitutions mandate that "a warrantless search or seizure is presumed unreasonable, and the evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629; see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Though a warrant is normally required when a police officer intrudes upon the privacy of a citizen, see INS v. Del Gado, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762 (1984), there are exceptions to the warrant requirement. One exception exists "when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." Binette, 33 S.W.3d at 218 (citing Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). We have noted that "[u]pon turning on the blue lights of a vehicle, a police officer has clearly initiated a stop and has seized the subject of the stop within the meaning of the Fourth Amendment of the Federal Constitution and Article I, section 7 of the Tennessee Constitution." Id. (citing State v. Pulley, 863 S.w.2d 29, 30 (Tenn. 1993)). Accordingly, in the instant case, when Officer Kohl stopped Garcia's vehicle by turning on her blue lights, she must have had reasonable suspicion, supported by specific and articulable facts, that the defendant had committed, or was about to commit, a criminal offense in order for the stop to be constitutionally valid.

Determining whether reasonable suspicion existed in a particular traffic stop is a fact-intensive and objective analysis. The United State Supreme Court has stated that "[i]n determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances." Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (citing United State v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); see also State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997).

In the instant case, the defendant, citing this Court's decision in Binette, argues that there was no reasonable suspicion to validate the initial traffic stop. In Binette, the defendant was convicted

---

[3] The Fourth Amendment to the United States Constitution is applicable to the states via the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

for DUI after being stopped by a Chattanooga, Tennessee, police officer. The officer had followed Binette for several minutes and videotaped the defendant's driving before stopping him. During the videotape, the officer made several comments about driving errors he claimed were being made by Binette, including speeding, crossing the yellow line, and swerving within his own lane all the way to the center line. Upon a *de novo* review, this Court reversed the defendant's conviction holding that "[w]hile Binette did move laterally at times within his lane while operating his vehicle, we find that his movement was not pronounced, and therefore did not give rise to reasonable suspicion." Binette, 33 S.W.2d at 220.

Conversely, the State argues in this case that the following specific and articulable facts gave rise to a reasonable suspicion that the defendant was either intoxicated while operating his vehicle or falling asleep shortly before being stopped by Officer Kohl: 1) the defendant was weaving back and forth within his own lane in a continual manner in Davidson County; and 2) there was considerable high-speed traffic, some of which can be seen braking when approaching Garcia's vehicle and trying to pass.

We have viewed the videotape and reviewed the testimony of Officer Kohl pertaining to the defendant's driving shortly before the traffic stop. Much like Binette, we find no evidence "of pronounced weaving or hard swerving" by Garcia. Binette, 33 S.W.3d at 219. In fact, despite the testimony of Officer Kohl, we are unable to detect any weaving upon viewing the videotape.[4] We also note that both the majority and dissenting opinions of the Court of Criminal Appeals in this case concluded that the defendant remained within his lane at all times and did not exhibit any weaving that was either exaggerated or pronounced. However, "[t]he number of times that a vehicle touches a center line or drifts within a lane is not dispositive" of whether reasonable suspicion existed to validate a traffic stop. Id. "Rather, as we have previously noted, a court must consider the totality of the circumstances in determining whether reasonable suspicion was present at the time a stop was initiated." Id.

Prior to Officer Kohl's stop of the defendant, the videotape reveals that Garcia was traveling at what appears to be a safe rate of speed in the far right lane of an interstate highway. The videotape also reveals that Garcia slowly moved his vehicle slightly within his lane of travel approximately twice over a period of approximately two minutes. At no point does the vehicle exhibit any sharp or jerking movements. While there is a short period of time when the vehicle is not visible on the videotape, we find no testimony in the record suggesting that the defendant exhibited any pronounced or exaggerated swerving during that brief time period. Moreover, we place little weight on the fact that there was considerable traffic on the interstate on the night of the defendant's traffic stop. The videotape reveals that several cars approached the defendant from the rear and easily passed his vehicle by moving to the next lane. Additionally, the State does not contest that the

_____

[4] With due respect to the author of the dissenting opinion, we did not find the videotape to be "dark, indistinct, and mainly consist[ing] of diffused light." Conversely, we were able to see clearly what was depicted with respect to the defendant's driving, other traffic, and the condition of the roadway.

defendant was driving in compliance with Tennessee Code Annotated section 55-8-123(1) (1998), which states:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made safely . . . .

At the suppression hearing, the State introduced section 12.68.170 of the Metropolitan Nashville Code which proscribes driving carelessly "so as . . . to endanger the life, limb, or property of any person." Given that Officer Kohl testified that she did not witness the defendant speed, drive too slowly, cross any lanes of traffic, illegally pass another vehicle, follow too closely, commit a violation regarding use of the turning signal, or drive on the shoulder, we agree with the lower court that neither the videotape nor Officer Kohl's testimony reflect that, at the time he was pulled over, the defendant was currently endangering "the life, limb, or property of any person."

In short, in accordance with the Odom standard, we conclude that the trial court's findings of fact at the suppression hearing are not supported by the preponderance of the evidence. Accordingly, we hold that as a matter of law there was no reasonable suspicion to stop Garcia. While the defendant's driving may not have been perfect, we saw no evidence of weaving on the videotape, and we reiterate that "it is the rare motorist indeed who can travel for several miles without occasionally varying speed unnecessarily, moving laterally from time to time in the motorist's own lane, nearing the center line or shoulder, or exhibiting some small imperfection in his or her driving." Binette, 33 S.W.3d at 219 (quoting State v. Binette, 1999 WL 427606 at *2 (Tenn. Crim. App. 1999) (Smith, J., dissenting)).

## ATTENUATION

Having determined that there was no reasonable suspicion to stop the defendant, the next inquiry is whether the evidence discovered during the illegal stop must be suppressed. Although the Court of Criminal Appeals held that the evidence was obtained during an unlawful stop of the defendant, it nevertheless held that the exclusionary rule would not bar introduction of the discovered methamphetamine because Garcia's consent to search the vehicle was sufficiently attenuated from the unlawful seizure. We disagree.

The history and purpose of the exclusionary rule have been well chronicled. In Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407 (1963), the Supreme Court acknowledged that it acts as a prophylactic guard to bar the admissibility of evidence obtained in violation of an individual's Fourth Amendment rights. However, the Court refused to hold that all evidence obtained as a result of police misconduct would be considered "'fruit of the poisonous tree' simply because [the evidence] would not have come to light but for the illegal actions of the police." Id. at 487-88.

We note at the outset that "a consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality." See Wayne LaFave, 3 Search and Seizure § 8.2(d) at 656 (3d ed. 1996). In this case, the defendant does not argue that his consent was involuntary. He clearly acknowledged at trial that he voluntarily signed the consent to search form prepared by Officer Kohl, fully understanding that he could revoke his consent at any time. Thus, the issue before us is whether the defendant's consent was an exploitation of the prior unlawful seizure.[5]

We have previously noted that attenuation issues are highly factual. See State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). In making our evaluation, we look to the factors articulated by the Supreme Court in Brown v. Illinois, 442 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Though the Brown factors were designed to aid courts in determining whether a confession was obtained by exploitation of an illegal arrest, these factors may also be used by courts to evaluate whether the causal connection between an unlawful seizure and a subsequent consent has been broken, i.e. whether the primary taint of an unlawful seizure has been sufficiently attenuated from the voluntary consent. The Brown factors are as follows: 1) the temporal proximity of the illegal seizure and consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. Id.[6] Additionally, we note that the burden of showing attenuation lies with the State. See Brown, 422 U.S. at 604.

The first Brown factor for our consideration is the temporal proximity of the illegal seizure and consent. Various courts addressing this factor have noted that "[a] brief time lapse between a Fourth Amendment violation and consent often indicates exploitation [of the prior illegal police action] because the effects of the misconduct have not had time to dissipate." State v. Hansen, 63 P.2d 650, 666 (Utah 2002) (citing State v. Shoulderblade, 905 P.2d 289, 293 (Utah 1995)); see also United States v. Melendez-Garcia, 28 F.3d 1046, 1055 (10th Cir. 1994); State v. Williams, 571 S.E.2d 703, 711 (S.C. Ct. App. 2002) (finding no attenuation where only a minimal time passed between illegality and consent). Here, the lapse of time between the illegal detention and consent was negligible. The illegal detention began when Officer Kohl turned on the blue lights during the traffic stop and did not end until she told Garcia that the stop was complete. Immediately thereafter, Kohl began asking the defendant more questions and had obtained his voluntary written consent within a scant few minutes. Hence, no appreciable time passed between the defendant's unlawful detention and the consent that would have allowed the taint of the misconduct to dissipate. Thus, this factor weighs against a finding of attenuation.

---

[5] Both sides have argued that the other party has waived the attenuation issue by failing to raise it at the trial level. However, because the issue of attenuation did not arise until the Court of Criminal Appeals determined the traffic stop to be unlawful, we will address the issue on the merits.

[6] Though the application of the attenuation doctrine to a consent following an illegal seizure is an issue of first impression for this Court, we have previously adopted the Brown attenuation factors to evaluate whether a confession was admissible following a Fourth Amendment violation. Huddleston, 924 S.W.2d at 674.

Next, we consider whether the presence of intervening circumstances support a finding of attenuation. The State argues that Officer Kohl's unequivocal statement to the defendant that he was free to go was an intervening circumstance which purged the taint of the prior illegality. Several courts have held that communication to a driver that he or she is free to go prior to requesting consent serves to attenuate the consent from the illegal traffic stop. See, e.g., State v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994); United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994); United States v. Ramstad, 120 F.Supp.2d 973, 980 (D. Kan. 2000). While we agree with those courts that such an action by a police officer does act as an intervening circumstance weighing in favor of attenuation, we are also mindful that a citizen who has been subjected to a traffic stop is not likely to walk away from continued police questioning, despite being told that he or she is free to leave. See Commonwealth v. Strickler, 757 A.2d 884, 898 (Pa. 2000) (noting that the "element of coercion is obviously enhanced when police actually detain a citizen . . . by means of a traffic stop"). In this case, the defendant's willingness to answer more of Officer Kohl's questions could have been influenced by the fact that another police car with flashing blue lights had arrived on the scene during the traffic stop.

Several commentators, including Harvard Law Professor William J. Stuntz have opined that "ordinary people never feel free to terminate a conversation with a police officer." William J. Stuntz, *Terry's Impossibility*, 72 St. John's L. Rev. 1213, 1215 (1998). The Supreme Court of Virginia recently echoed this concern in a case similar to the instant case when it held that a motorist who was told by an officer that he was "free to leave" but immediately was asked questions concerning whether he had any weapons or drugs was re-seized upon continued questioning. Reittinger v. Commonwealth, 532 S.E.2d 25, 28 (Va. 2000). Thus, while we acknowledge the fact that Garcia was told he was free to go, we give this factor little weight given the immediacy with which Officer Kohl began questioning the defendant after telling him he was free to leave and the presence of the other police cruiser.

Finally, we consider the purpose and flagrancy of the official misconduct. The final Brown factor we consider particularly important because it is most closely tied to the rationale of the exclusionary rule -- to discourage police misconduct. See Brown, 422 U.S. at 604; Huddleston, 924 S.W.2d at 676; State v. Richter, 612 N.W.2d 29, 41 (Wis. 2000). In this case, there was no reasonable suspicion to stop the defendant. However, assuming *arguendo* that Officer Kohl had reasonable suspicion to suspect that the defendant was intoxicated, by her own account, Kohl knew two minutes into the stop that the defendant was not intoxicated. Yet, she retained his driver's license and vehicle registration, wrote out a warning ticket even though no crime had been committed by the defendant, prepared a consent to search form in Spanish, and radioed for a drug-detection dog. All these actions were taken despite there being no reasonable suspicion that the defendant was engaged in criminal activity. Kohl's status as a member of the drug task force adds to the likelihood that her prolonged and unreasonable detention of the defendant was for the sole purpose of obtaining consent to search his vehicle. Under such circumstances, we conclude that the defendant's consent was gained in exploitation of the unlawful detention.

In his dissenting opinion in the court below, Judge John Everett Williams emphasized that the extended detention of the defendant revealed that the defendant's consent was obtained by exploitation of the prior illegality:

> [T]he issuance of the warning ticket resulted in the continuation of an unlawful detention, and appears to have been pre-text to allow the officer the opportunity to prepare a consent form in Spanish. The warning ticket took some ten to twelve minutes to issue. . . .
>
> My review of the record and video tape (sic) revealed a perfectly choreographed performance by the officer subjectively calculated to and objectively resulting in exploitation of the illegal stop and detention of the defendant in order to obtain his consent to search. Assuming arguendo that the purpose of the illegal stop was not to obtain consent to search the vehicle, the continued detention of the defendant under the guise of issuing a warning ticket was clearly in pursuance of a conscious objective to obtain consent to search.

State v. Garcia, No. M2000-01760-CCA-R3-CD, at 2-3 (Tenn. Crim. App. May 15, 2001) (filed at Nashville) (Williams, J., dissenting).

After a thorough review of the record, we agree with Judge Williams that Officer Kohl's attempt to gain the defendant's consent to search the vehicle was done through exploitation of the illegal detention of the defendant. Officer Kohl's (unreasonable) suspicion that the defendant was intoxicated was quelled two minutes into the traffic stop. As a result, she had no reasonable basis to detain the defendant. Likewise, because the defendant had broken no traffic law, we question under what authority she issued the warning ticket. Thus, we conclude that this factor weighs against a finding of attenuation.

Accordingly, after due consideration of the Brown attenuation factors, we conclude that the State has failed to carry its burden of demonstrating that the consent was sufficiently attenuated from the unlawful detention. Thus, we are constrained to hold that the methamphetamine, obtained during an unlawful detention of the defendant, should have been suppressed.

## CONCLUSION

In sum, we hold that the traffic stop of the defendant in this case was not based upon reasonable suspicion in violation of the Fourth Amendment and Article I, section 7. We also hold that although the defendant's consent to search his vehicle was given voluntarily, the evidence seized must be suppressed because the consent was not sufficiently attenuated from the unlawful detention. Accordingly, the defendant's conviction is reversed, and the cause is remanded to the Criminal Court for Davidson County for proceedings consistent with this opinion.

Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, JUSTICE