# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 11, 2012 Session

## STATE OF TENNESSEE v. MARIO OCHOA

**Appeal from the Criminal Court for Sumner County**
**No. 894-2010     Dee David Gay, Judge**

_____

### No. M2011-02400-CCA-R3-CD - Filed December 7, 2012

_____

Following a traffic stop and search of his vehicle that uncovered over five kilograms of cocaine, the defendant, Mario Ochoa, was indicted by the Sumner County Grand Jury with possession of over 300 grams of cocaine with the intent to sell or deliver, a Class A felony. He subsequently pled guilty to possession of .5 grams or more of cocaine with the intent to sell or deliver, a Class B felony, in exchange for a Range I sentence of twelve years in the Department of Correction, reserving the following certified questions of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(A): (1) whether the officer had reasonable suspicion to stop his vehicle; (2) whether the officer exceeded the scope of the stop once he discovered that the defendant's temporary license tag was valid; (3) whether the evidence should be suppressed because the defendant's consent to search the vehicle was not sufficiently attenuated from the prior seizure; and (4) whether the search of the vehicle exceeded the scope of what a reasonable person would have understood to have been meant by the defendant's consent. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Jeffery S. Frensley, Nashville, Tennessee, for the appellant, Mario Ochoa.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

On the morning of October 29, 2010, Investigator Edward Williams of the Hendersonville Police Department, who was assigned to the 18th Judicial District Drug Task Force Highway Interdiction Team, stopped the defendant's vehicle near mile marker 107 on Interstate 65 in Robertson County based on his inability to read the issuing state on the defendant's temporary license plate. Once stopped behind the defendant's vehicle, he was able to tell that the issuing state was Texas and he wrote the defendant a warning ticket for the violation. During the course of the stop, he also radioed for backup from his fellow drug interdiction officers, asked the defendant a series of questions about whether he had any illegal substances in his vehicle, sought and received the defendant's consent to search the vehicle, and, with the assistance of two fellow officers, conducted an extensive search of the vehicle that lasted over an hour and eventually involved the use of a drug dog, which "alerted" at the back bumper area of the vehicle. Investigator Williams then sought and received the defendant's permission to take the vehicle to the Sumner County Sheriff's Department to continue the search. During that second search, the officers uncovered five plastic wrapped packages containing a total of 5.78 kilograms of cocaine, which were hidden in two compartments in an after-market panel located behind the vehicle's rear bumper cover.

The defendant was subsequently indicted for possession of more than 300 grams of cocaine with the intent to sell or deliver, a Class A felony. Prior to trial, he filed a motion to suppress the evidence on the basis that Investigator Williams lacked reasonable suspicion or probable cause for the initial traffic stop, that his consent was not sufficiently attenuated from the initial illegal stop, and that the searches exceeded the scope of his consent.

At the suppression hearing, Investigator Williams testified that on the morning of October 29, 2010, he was in the center median at mile marker 98 of Interstate 65 when he noticed the defendant's vehicle, a white Chrysler 300, pass him traveling northbound in the slow lane. The vehicle did not appear to have a license plate, so he pulled onto the interstate and began following it. As he did so, he observed that the defendant's vehicle had some sort of paper tag and that the defendant appeared to be traveling in unison with two other vehicles with permanent Texas license plates, one of which was traveling in front of the defendant, with one to two vehicles in between, and the other of which was traveling behind the defendant, again with one to two vehicles in between.

Investigator Williams testified that he pulled beside the defendant and drove next to him in the fast lane for approximately one-half to three-quarters of a mile, looking over toward him as he did so. During that time, the defendant kept his hands in a "very rigid posture" in the 10 o'clock and 2 o'clock positions on the steering wheel and never looked at

him. He next pulled alongside each of the two vehicles with permanent Texas plates to look in turn at their drivers before pulling off the interstate to let traffic pass and then pulling back onto the interstate and behind the defendant's vehicle.

At approximately 8:30 a.m., he initiated a stop of the defendant's vehicle based on his inability to read the tag clearly while traveling at a distance of five to six car lengths behind the vehicle. Specifically, he stated that, although he was able to see the main numbers at the center of the tag, he was unable to read the expiration date or the state of issuance, both of which appeared to be partially obscured by "some type of plastic cover over the tag" and the screws of the bracket that held the plastic cover in place. He explained the problem with the plastic cover as follows: "When it's a real thin plastic the wind from traveling causes it to move which picks up glare from the sun, headlights, or just the regular lighting . . . and causes it to be difficult to read a tag." He said he was able to see that the tag had been issued by the State of Texas after he had stopped behind the defendant's vehicle. He then approached the passenger side of the defendant's vehicle, told the defendant the reason for the stop, inquired where he was going and the purpose of his trip, and asked him to step to the rear of his vehicle so that he could show him the violation.

Investigator Williams testified that his suspicions about the defendant were further aroused after he had initiated the stop. The defendant told him that he was relocating from Austin, Texas to Cincinnati, Ohio, but the vehicle was clean with very little "road trash" inside it; the defendant had only a small overnight bag in the trunk; and there were no other keys attached to the key ring with the vehicle's ignition key, which appeared to be on "a card or a tab . . . that you would more likely see at a car lot." The defendant was also unable to give him the address in Ohio to which he was moving; was vague about the kind of work he did and the job waiting for him in Ohio; gave varying answers to how long he had owned the vehicle and from whom he had bought it; appeared to look toward the interstate as if to see if anyone had stopped with him before answering whether he was traveling alone; appeared nervous, wiping sweat from his palms and swaying from side to side; and attempted to divert his attention from the stop by engaging him in conversation about hunting and sports. In addition, the defendant did not have registration papers for the vehicle and provided him with a title from the State of Virginia on which the name of the owner did not appear.

Investigator Williams testified that he called for backup approximately eight minutes into the stop due to the above circumstances and behaviors, which he believed based on his extensive training and experience were "indicators of criminal activity." He said that when he gave the defendant a warning ticket approximately thirteen to fourteen minutes into the stop, the defendant extended his hand as if to shake hands with him but then took a step backward and answered "no" when he asked him if he was traveling with anything illegal. He asked the defendant if there were any weapons, explosives, or drugs in the vehicle, and

the defendant answered no to each question, changing from a joking to a serious demeanor at the mention of drugs. He then asked the defendant if he had large sums of U.S. currency in the vehicle, but instead of answering, the defendant "revisited the drug issue," telling him that he had some allergy medication in the vehicle.

Investigator Williams testified that he next questioned the defendant about specific drugs, asking if he had any marijuana, ecstacy, heroin, or cocaine. He said that the defendant answered no to each of his questions but exhibited a "major body movement," dropping his hand to his side and shifting to the left, when he asked him about cocaine. Earlier in his testimony, Investigator Williams explained that he had been trained as a narcotics officer to notice "four major body movements" that are indicative of deception.

Investigator Williams testified that he asked the defendant for permission to search his vehicle, and the defendant replied, "Sure, go ahead." He then asked the defendant if he could pat him down for weapons, and the defendant consented. Afterwards, the defendant remained standing at the front of his patrol vehicle as he began his search by first examining the passenger compartment before moving to the trunk of the vehicle.

Investigator Williams testified that he was in the process of opening up the defendant's overnight bag in the trunk when Investigators Irwin and Cothron arrived on the scene and continued with the search while he went back to his patrol car to run a check on the defendant and the vehicle through the "Blue Light Operation Center," which covered the Gulf Coast region. During that process, he observed that the defendant's "stress and anxiety level went through the roof," as Investigator Irwin was searching the trunk area of his vehicle. Approximately six minutes later, Investigator Williams learned from the Blue Light dispatcher that the defendant, who had earlier told him that he had been arrested for "domestic," had three marijuana convictions, a pending marijuana charge, and some unspecified involvement with organized crime. When he returned to the defendant and asked him again if he had been arrested for anything other than the domestic charge, the defendant told him that he had been arrested for marijuana possession but that it was a simple "cite and release" offense in the State of Texas. The defendant did not tell him about his other arrests or that he had a pending marijuana charge.

Investigator Williams testified that as the spare tire was removed from the vehicle during the search, "the rear grommet for the back of the bumper fell forward" and a couple of the plastic push pins holding it in place fell down into the tire well, which indicated to him that "the vehicle ha[d] been apart" and was "not put back together very well." In addition, he noticed that the corners of the screws that held the bumper cover to the vehicle's wheel wells "were worn off to indicate that they were frequently removed," that some metal "pop rivets" holding the bumper cover in place had been cut off and black magic marker used to

color the center of the rivets "to match the rest of it," and that the bumper appeared, from underneath the vehicle, to have been freshly painted. Investigator Williams said that he was able to see the defendant's reaction as he was lying on the ground inspecting the bumper and that the defendant's stress level, once again, appeared "to go through the roof." He stated that after popping off more pins with a pry tool, he pulled back the bumper cover and immediately smelled fresh paint and "bondo." As he looked closer, he saw "what appeared to be a welded aftermarket compartment" with two access panels secured by Phillips head screws.

Investigator Williams testified that Investigator Irwin conducted a narcotics sweep of the vehicle with his drug dog a little over an hour into the stop, after their discovery of the after-market welded compartment, and that the dog alerted for the presence of narcotics in the vehicle. At that point, he had a conversation with the defendant about the "peculiarities" he had found in the vehicle and asked his permission to take it to the drug task force office to be examined further. The defendant replied that it was "fine," but if they "removed any panels or anything to be sure and put the car back together."

Investigator Williams testified that Investigator Cothron drove the defendant's vehicle to the Sumner County Sheriff's Department, approximately 22 to 25 minutes away, while he followed behind with the defendant as a passenger in his vehicle. At the office, the defendant's vehicle was pulled into their garage, where he and his fellow officers removed the access panels from the bumper and discovered five bags containing a substance that field-tested positive for cocaine and weighed a total of 5.78 kilograms. During the search, the defendant was either outside smoking a cigarette or inside the lobby with a window view into the garage area. He did not explain to the defendant the procedures they would employ in the search at the Sheriff's Department or tell him the distance they would have to travel to reach their garage. The defendant, however, never expressed any reservations about having given them his consent to search, and he had a view at all times of the garage area where the search was conducted.

On cross-examination, Investigator Williams conceded that he never said anything to the defendant about his inability to read the expiration date on his temporary tag but instead told him that he could hardly read the word "Texas," although he knew it was "beyond [the defendant's] control." He acknowledged that all the information on the tag was printed rather than handwritten, that the font was larger than the font used on a typical Tennessee temporary tag, and that the tag was securely mounted in the proper position and height on the vehicle. He further acknowledged that he was able to determine the issuing state and the expiration date of the tag by the time he had exited his patrol car and was approaching the defendant's vehicle. He also conceded that the brackets did not cover any of the writing and that he never instructed the defendant to remove the plastic cover from the tag.

Investigator Williams denied that he purposely delayed writing the warning ticket in order to allow his fellow officers and the drug dog time to arrive at the scene. He admitted, however, that he did not tell the defendant he was free to go as he handed him the ticket. He also acknowledged that he did not tell the defendant he could refuse his request to search his vehicle, that other officers would be assisting in the search, that he anticipated it would last over an hour, or that they would use tools during the search. On redirect examination, he testified that the defendant never asked him to stop the search.

Investigator Kyle Irwin testified that during his search of the vehicle on the roadside he, among other things, popped open the side panels of the dashboard to look inside the dash, popped up the backseat to look underneath, removed the spare tire and carpet from the trunk, removed the defendant's overnight bag and hygiene kit, and popped the air filter open and looked inside it. He said that after Investigator Williams showed him the "heavy tooling" on the rear bumper cover, both he and Investigator Williams crawled underneath the car, where he could both see and smell the fresh paint that had been applied. Investigator Williams then removed the license plate and popped off the bumper cover, which revealed that "it was not a real bumper" but instead a "manufactured bumper" with "two access plates." At that point, Investigator Irwin ran his drug dog around the vehicle, and the dog "alerted" at the trunk area. Investigator Irwin testified that they used an upholstery pry tool, a screwdriver, a scope, and possibly a socket set during their search, but nothing on the vehicle was damaged. He acknowledged on cross-examination that he did not ask the defendant's permission to "pry parts of his car apart" during the search.

On May 16, 2011, the trial court entered a lengthy written order overruling the motion to suppress. In its order, the court provided a detailed review of the time frames and conversations between the officers and the defendant as recorded by Investigator Williams' dashboard camera. Among other things, the court found that the initial stop was valid based on the fact that the defendant's temporary tag was not legible as required by Tennessee law, that the officer's thirteen-minute-and-twenty-seven-second detention of the defendant following the initial stop was justified by the circumstances, and that neither the initial search at the roadside nor the subsequent search at the drug task force headquarters exceeded the scope of the consent given by the defendant for those searches. Thereafter, the defendant pled guilty to the Class B felony of possession of .5 grams or more of cocaine with the intent to sell or deliver, reserving the following certified questions of law, which he states as follows:

I. Whether there was reasonable suspicion to stop Defendant Mario Ochoa.

II. Whether the officer exceeded the scope of the stop once he discovered the posted license tag was valid.

III. Whether the evidence discovered during Mr. Ochoa's stop must be suppressed because his consent was an exploitation of and not sufficiently attenuated from the prior seizure.

IV. Whether the search of Mr. Ochoa's vehicle exceeded the scope of the consent that a reasonable person would have understood by the exchange between the officer and Mr. Ochoa.

## ANALYSIS

### I. Standard of Review

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

### II. Suppression Issues

### A. Initial Stop

The defendant first contends that the trial court erred in finding that Investigator Williams had reasonable suspicion for the initial stop of the vehicle based on the alleged license plate violation. Among other things, he points out that the Tennessee Code does not specify the distance from which the issuing state must be visible but states only that the pertinent information must be "legible" and that the tag number must be visible from a distance of 100 feet during the daylight hours. See Tenn. Code Ann. §§ 55-4-102(b); -103(c). The defendant asserts that because the tag was clearly printed and was not obstructed, obliterated, or adulterated in any fashion, the trial court erred in finding that the officer's inability to read the issuing state while traveling behind the vehicle rendered the tag "illegible" and provided reasonable suspicion for the stop. The State disagrees, arguing that the officer was justified in stopping the vehicle based on the fact that the tag was not fully legible to him prior to the stop. We agree with the State.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. (citations omitted).

An exception to the warrant requirement exists when an officer has either probable cause, or reasonable suspicion supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Terry v. Ohio, 392 U.S. 1, 21 (1968); State v. Binette, 33 S.W.3d 215, 219 (Tenn. 2000). Reasonable suspicion is an objective standard and must be determined from the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417-18 (1981); see Ornelas v. United States, 517 U.S. 690, 696 (1996). "An officer's subjective intention for stopping a vehicle is irrelevant, as long as independent grounds exist for the detention." State v. Orson Wendell Hudson, No. M2004-00077-CCA-R3-CD, 2005 WL 639129, at *3 (Tenn. Crim. App. Mar. 15, 2005) (citing Whren v. United States, 517 U.S. 806 (1996)). An officer's observation of a violation of a traffic law provides an objective basis for stopping a vehicle. See, e.g., State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997); State v. Levitt, 73 S.W.3d 159, 173 (Tenn. Crim. App. 2001).

At the suppression hearing, defense counsel essentially conceded that the initial traffic stop based on the officer's inability to read the tag was lawful and instead concentrated his argument on the officer's prolonged detention of the defendant after the stop. The trial court, thus, made the following findings of fact and conclusions of law in addressing the validity of the initial stop:

> Although the parties have agreed that the initial stop of the Defendant was valid, based upon reasonable suspicion and supported by specific and articulable facts, the Court finds that it is absolutely necessary to set out all the relevant facts in a fact-specific and fact-intensive analysis demanded by the issues raised in this case.

> The facts developed at the evidentiary hearings are not in dispute and were fully developed through the testimony of Off. Williams, Off. Irwin, and from the videotapes of the stop, detention, consent, and search of the Defendant's vehicle. . . . Because [Officer Williams] could not read the

Defendant's license plate clearly, he stopped the Defendant's vehicle . . . . Once Off. Williams left his vehicle and looked at the license after the Defendant's car was stopped, he could see that the Defendant was driving a vehicle with a temporary Texas license, and that the plastic cover made it more difficult to read. Off. Williams testified that at no time was this tag visible until he was able to approach and see the tag after the Defendant's vehicle was stopped. It is clear from the testimony and the videotape that the Defendant's temporary tag was not "legible" as required by Tennessee law.

The evidence does not preponderate against these findings. Tennessee Code Annotated section 55-4-110(b) provides in pertinent part that:

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible[.]

Tenn. Code Ann. § 55-4-110(b). A violation of the section is a Class C misdemeanor. Id. § 55-4-110(c).

Investigator Williams testified that he initiated the stop because he was unable to read the issuing state or expiration date on the defendant's temporary tag while traveling at a distance of five or six car lengths behind the defendant's vehicle. He then explained that when the vehicle was in motion the wind caused the clear plastic covering over the temporary tag to move, which obscured the writing on the tag. Thus, we agree with the State that this case is distinguishable from United States v. Granado, 302 F.3d 421 (5th Cir. 2002), cited by the defendant, in which the Fifth Circuit Court of Appeals concluded that the defendant's rear plate frame did not violate the Texas statute on the proper display of a license plate because the frame did not obscure any of the numbers or letters of the plate and the plate was not covered by any "blurring matter" or "coating, covering, or protective material disturbing angular visibility." Id. at 423-24.

We also agree with the State that United States v. Edgerton, 438 F.3d 1043 (10th Cir. 2006), does not provide support for the defendant's argument that Investigator Williams lacked reasonable suspicion to stop his vehicle because it was clear to him before he initiated the stop that the vehicle had a temporary license plate in place. In Edgerton, the Tenth Circuit Court of Appeals upheld the ruling of the district court that an officer had reasonable suspicion to stop a defendant's vehicle "not only because he could not read its temporary

registration tag while following at a safe distance, but also because he could not determine whether the document posted in the rear window was, in fact, a temporary tag[.]" Id. at 1047. The court focused in its ruling on the reasonable suspicion aroused in an officer by the failure of a vehicle "to display some form of visible license plate/registration tag, temporary or permanent," id. at 1048, without addressing whether the officer's inability to read the state of origin on the tag would have been sufficient, alone, to justify the stop. Notably, however, the court cited favorably a Kansas Court of Appeals case which upheld a Kansas state trooper's stop of a vehicle on the basis that its state of origin was not visible on its out-of-state license plate. Id. n.4 (citing State v. Hayes, 660 P.2d 1387, 1388-89 (Kan. Ct. App. 1983)).

We conclude, therefore, that the trial court properly found that Investigator Williams had reasonable suspicion to stop the defendant's vehicle.

### B. Detention Following Initial Stop

The defendant next contends that the trial court erred by finding that Investigator Williams was justified in detaining him for the approximate thirteen and a half minutes that elapsed following the initial stop of the vehicle until he received the warning ticket. The defendant argues that the purpose of the stop ended once Investigator Williams pulled up behind his vehicle and was able immediately to ascertain the state of issuance on his temporary plate and that the ensuing detention, questioning, and investigation were not reasonably related to the purpose of the stop, lasted much longer than necessary, and went far beyond the least intrusive means available to the officer. The State responds by arguing that the evidence supports the trial court's findings that the officer's actions were reasonably related in scope to the circumstances that justified the stop. We, once again, agree with the State.

An officer's actions following the stop of a vehicle based on probable cause or reasonable suspicion must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983); see also State v. England, 19 S.W.3d 762, 767-68 (Tenn. 2000). The officer should also employ the least intrusive means reasonably available in order to dispel the suspicion that gave rise to the stop. Royer, 460 U.S. at 500. "The proper inquiry is whether, during the detention, the officer diligently pursued a means of investigation that was likely to confirm or dispel suspicion quickly. A reasonable traffic stop can become unreasonable if the time, manner or scope of the investigation exceeds the proper parameters." State v. Brown, 294 S.W.3d 553, 562 (Tenn. 2009) (citations and internal quotations omitted).

"'[R]equests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop.'" State v. Harris, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008) (quoting State v. Gonzalo Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *22 (Tenn. Crim. App. Feb. 20, 2002), reversed on other grounds by State v. Garcia, 123 S.W.3d 335 (Tenn. 2003)). A driver who is stopped for a traffic violation "should expect 'to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.'" State v. Donaldson, ___S.W.3d___, 2012 WL 3667376, at *6 (Tenn. Aug. 24, 2012) (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). "[W]here a de minimis intrusion ends and an undue delay begins is necessarily a fact-specific inquiry." Id. (citation omitted).

The trial court found that the various suspicious circumstances that developed both before and after the stop, and which the court reviewed in detail in its order, justified the detention of the defendant from the time of the initial stop until the time the warning ticket was issued. The record does not preponderate against these findings and conclusions. Investigator Williams provided a long list of suspicious circumstances that, based on his training and experience, were indicators of criminal activity. These ranged from the defendant's appearing to travel in unison with two other vehicles and his rigid posture and demeanor while driving to his inability to provide the registration on the car and the fact that he produced a title, which was not in his name, from a state other than the one in which the vehicle was licensed and from which he claimed to be moving. In addition, he gave vague and inconsistent accounts about his ownership of the vehicle and his travel plans and appeared nervous when answering the officer's questions.

We agree with the trial court that the number and variety of suspicious circumstances, which developed both before and after the stop, distinguish this case from State v. Garcia, 123 S.W.3d 335 (Tenn. 2003), in which our supreme court concluded that an officer's initial stop and continued detention of a defendant were not based on reasonable suspicion and that the defendant's subsequent consent to search was not sufficiently attenuated from the unlawful stop and seizure. Id. at 342.

The officer in Garcia testified that she stopped the defendant because he was weaving in his lane, and she believed he might be intoxicated or falling asleep at the wheel. Id. at 338, 341. She said that she was satisfied two minutes into the stop that the defendant was not intoxicated, but the defendant subsequently gave inconsistent answers to who owned the vehicle and where he was going. Id. at 338. However, the vehicle was not stolen and the registration matched the vehicle. Id. After radioing for a drug dog and giving the defendant

a warning ticket, the officer told the defendant that the stop was complete but then asked him if he had any illegal weapons or drugs in the car. Id. at 339. According to her testimony, the defendant's demeanor changed at the mention of drugs, with his Adam's apple "bobbing up and down," an indicator of deception, as he answered no. Id. The defendant then consented to a search of his vehicle, which uncovered 40.1 pounds of methamphetamine. Id. at 340.

After reviewing the videotape of the stop, our supreme court found no evidence of any weaving or sharp or jerking movements by the defendant. Id. at 344-45. The court, therefore, concluded that the officer lacked reasonable suspicion for the stop. Id. The court further concluded, based in part on the officer's testimony that she knew two minutes into the stop that the defendant was not intoxicated, that the defendant's consent to search was gained in exploitation of his unlawful detention. Id. at 347-48.

In this case, by contrast, we have concluded that the initial stop was lawful based on Investigator Williams' inability to read the issuing state on the defendant's temporary license plate. Furthermore, more suspicious circumstances arose after the stop than in Garcia. These included the fact that the defendant's luggage and the condition of the vehicle did not substantiate his claim that he was making a cross-country move, his inability to produce the registration papers on the vehicle, his having only the ignition key to the vehicle on a tab or card like one commonly used at a car lot, his production of a title for the vehicle that was from a different state than the one from which he claimed to be moving and on which the name of the owner did not appear, his lying to the officer about his criminal record, and his inconsistent answers to the officer's questions about his travel plans.

### C.  Defendant's Consent as Exploitation of the Alleged Illegal Stop

The defendant next contends that the evidence should be suppressed because his consent to search the vehicle was not sufficiently attenuated from the illegal stop and seizure. However, our determination that the initial stop and seizure were valid renders this issue without merit.

### D.  Scope of Defendant's Consent to Search Vehicle

Finally, the defendant contends that the trial court erred in finding that the searches of the vehicle did not exceed the scope of what a reasonable person in his situation would have understood by the exchange between himself and Investigator Williams. In support, he cites the extended duration of the roadside search, the fact that multiple officers and a police dog were involved, and the officers' use of tools "to deconstruct the vehicle in order to conduct the search." He also points out that he was never informed of the distance he would have to travel to reach the police garage, the scope of the search that would occur there, or

that he had the right to revoke his consent to search.

In its thorough order, the trial court first reviewed the law regarding the scope of a consent to search before making the following findings of fact and conclusions of law with respect to this issue:

> The Court finds that the search of the Defendant's vehicle after his first consent at the side of the interstate was very thorough and detailed throughout the entire vehicle in areas that would, or could, specifically conceal "anything illegal," "weapons," "explosives," "large sums of money," or "drugs" including "marijuana," "cocaine," "ecstasy," and "heroin." The scope of the consent given first by the Defendant was not exceeded by the thorough search of the vehicle beside the interstate. Further, before the scope was expanded to cover the after market compartment that was located during the search, the Defendant gave consent for an expanded search as long as his vehicle was "put back together."

> . . . .

> Therefore, this Court specifically finds that the duration and scope of the search by the side of the interstate after Defendant's first consent was given was not unreasonable, and that after finding a post market compartment the scope of the consent search was expanded by the second consent given by the Defendant.

The record supports the findings and conclusions of the trial court. The standard for measuring the scope of a defendant's consent is "'that of objective reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect.'" State v. Troxell, 78 S.W.3d 866, 872 (Tenn. 2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). An officer's expression of the object of the search is relevant to the understanding of the typical reasonable person, as are any expressed or implied limitations by the person giving consent as to the time, duration, area, or intensity of the search. Id. at 871-72.

Here, the defendant answered "sure" to Investigator Williams' request, "Is it okay if I search your vehicle?" His consent to the search occurred almost immediately after he had answered "no" to questions of whether he had any drugs, weapons, large sums of currency, or anything illegal in the vehicle. He never revoked his consent or expressed any reservations about the extent or duration of the roadside search, and he agreed to allow the officers to take the vehicle to their headquarters to continue the search so long as they put the

vehicle back together.  At one point during the drive to the garage, he made a joking comment about Investigator Williams taking him on a tour of the rural countryside and mentioned that he needed to get back on the road.  That was the extent of his protest, however, and he never said anything to the officer about wanting to revoke his consent to search.  Under these circumstances, we conclude that the trial court properly found that the searches did not exceed the scope of the defendant's consents to search.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the trial court properly overruled the defendant's motion to suppress evidence uncovered during the stop and search of his vehicle.  Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE