# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 27, 2010 Session

## STATE OF TENNESSEE v. JOHN AYRES HEWITT

**Direct Appeal from the Criminal Court for Knox County**
**No. 86629     Bobby Ray McGee, Judge**

---

**No. E2009-01314-CCA-R3-CD - Filed November 29, 2010**

---

Appellant John Ayres Hewitt was convicted of driving under the influence (DUI), third offense and several other offenses stemming from a traffic stop and ensuing blood alcohol test. He was given an effective sentence of 11 months and 29 days, which was to be suspended after 150 days in custody. On appeal, Appellant contends that the arresting officer lacked probable cause to initiate the traffic stop. Appellant cites the videotape from the officer's dashboard camera as evidence that he did not engage in any suspicious driving and as a basis for discrediting the officer's testimony. Based upon our review, we see no error in the trial court's denial of Appellant's motion to suppress. However, we have determined that there are errors in the sentences noted on the judgments in counts ten and eleven. We therefore must remand the case to the trial court to address those judgments. The judgments are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

John E. Eldridge (on appeal) and Donald R. Coffey (at trial), Knoxville, Tennessee, for the appellant, John Ayers Hewitt.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Sarah Winningham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# I.  Factual Background

Knoxville Police Officer Clayton Madison was on patrol near the intersection of Middlebrook Pike and Vanosdale on March 21, 2006, when he received a "be on the lookout" (BOLO) notice regarding a possible drunk driver.  Officer Madison then saw a car matching the description given in the BOLO.  He pursued the car, which Appellant was driving, and said he saw it veering in and out of its lane.  Officer Madison pulled Appellant over and approached the car, where he found two open containers of beer.  Appellant refused to perform any field sobriety tests, so Officer Madison transported him to the University of Tennessee Medical Center for a blood test.  The test revealed Appellant's blood alcohol level was above the legal limit.  Appellant was charged with DUI and several other traffic offenses.

Appellant moved to suppress the evidence gathered from Officer Madison's stop. Appellant asserted that Officer Madison did not have reasonable suspicion for the stop and that the video from Officer Madison's dashboard camera revealed that Appellant was not driving in a suspicious manner.

Officer Madison was the only witness to testify at the suppression hearing.  He testified that he had been with the Knoxville Police Department for five years and had been trained in DUI detection and investigation.

Officer Madison recalled that he received a BOLO regarding a possible drunk driver and then saw Appellant's car, which matched the description.  He turned onto Middlebrook Pike and "observe[d] [Appellant] for a while."  Officer Madison testified that he witnessed Appellant "[drive] outside his lane lines a couple of times over a considerable distance."  He said that when Appellant drove over the lane line, "[i]t wasn't like he bounced over and then bounced back.  He drove across for a considerable distance in relation to the way we were driving."  He further testified that Appellant "almost struck one car."

On cross-examination, the defense played a portion of the video recorded by Officer Madison's dashboard camera.[1]  Officer Madison said that the video showed Appellant driving on the lane line "for quite a while."  However, he acknowledged that the video did

---

[1] It appears that the video was first played on cross-examination.  The transcript does not reflect that the State played the video during direct examination, and the defense introduced the video into evidence at the conclusion of Officer Madison's testimony.  The record is not clear, however, because page 9 of the motion to suppress hearing transcript, which likely contains the hearing's first reference to the video, is not contained in the record.  Instead, the ninth page of the suppression hearing transcript in the record before us appears to be a duplicate of page 9 of the trial transcript.

not show Appellant nearly hit another car; Officer Madison testified that the near-collision took place off camera. Officer Madison also testified on cross-examination that he had to sound his horn "a couple of times" before he could get Appellant's attention to pull him over.

The court heard argument from both sides at the conclusion of Officer Madison's testimony. Appellant asserted that the video did not show any erratic driving and instead showed him immediately and properly react to Officer Madison's signals. The State countered that Officer Madison testified about more than what is depicted in the video and that Officer Madison's testimony provided a sufficient basis for the stop.

The court agreed with the State. It noted that it was "required to consider [Officer Madison's] testimony." The court then discounted the evidentiary value of the video, explaining that because the camera was stationary, it could not "necessarily see[] everything that the officer could have seen." The court accepted Officer Madison's testimony that he saw Appellant cross the lane line "on multiple occasions" and nearly hit another car. It specifically found that "this officer . . . was credible that he saw things [that] may not have been on the videotape." It thus found that Officer Madison had "at least a reasonable suspicion" justifying the stop and denied Appellant's motion.

Officer Madison's trial testimony repeated much of his testimony at the suppression hearing. It diverged slightly when he said that Appellant "almost struck a couple of vehicles," rather than just one. However, he again stated that he witnessed Appellant cross the lane line and nearly hit another car. He said that those events occurred before Appellant's car was clearly visible on the video.

On cross-examination at trial, Officer Madison testified that Appellant "was a considerable distance in front of [him] when [Appellant] was across the line." He also explained that there were "rather large curves" on the particular stretch of road and therefore there were periods where, because his "camera point[ed] straight ahead," it did not "catch [Appellant]." He conceded that the video did not show Appellant swerving or weaving, but Officer Madison said he was able to move his head to have a clear view of Appellant.

The court reaffirmed the suppression decision. It explained that "in order to sustain [Appellant's] position, [the court] would have to reject the officer's testimony." It found "no basis for doing that." It further noted that it "observed the officer's demeanor and listened to his voice, and [it] cannot just reject [his testimony] out of hand."

Appellant later filed a motion for a new trial, arguing that the trial court erred in denying the motion to suppress. At the hearing on the motion, Appellant contended that the video not only failed to confirm Officer Madison's testimony, it actually counseled against

finding that testimony credible. Appellant argued that "it stretches all sense of reason" to believe that Officer Madison could have seen what he testified he saw because the video shows that he had to drive quickly for a significant period just to catch up to Appellant.

The trial court again rejected Appellant's position, reiterating that it "could not find a basis to find that . . . [Officer Madison] was being deceptive or could not find a basis to reject his testimony." Instead of having an "actual basis" to discredit Officer Madison's testimony "other than just to speculate that the officer was lying," the court would not reconsider its decision. It denied Appellant's motion, and this appeal followed. The only issue on appeal is whether the trial court erred in denying the motion to suppress.

## II. Analysis

We begin by addressing the appropriate standard of review. Citing our supreme court's decision in State v. Binette, 33 S.W.3d 215 (Tenn. 2000), Appellant contends that, because "the events in the instant case leading to [Appellant's] arrest were captured on a police dashboard video . . . a court reviewing [Appellant's] appeal is in the same position as the trial court to examine the evidence," and therefore should apply a de novo standard of review "without a presumption of correctness." We disagree.

Binette applies only "when a trial court's findings of fact at a suppression hearing are based on evidence that does not involve issues of credibility." 33 S.W.3d at 217. Because "[trial] courts are uniquely positioned to observe the demeanor and conduct of witnesses," the deferential standard of review described in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), is appropriate when the credibility of a witness is at issue. Binette, 33 S.W.3d at 217. "But when a court's findings of fact at a suppression hearing are based *solely* on evidence *that does not involve issues of credibility* . . . the rationale underlying a more deferential standard of review is not implicated." Id. (emphasis added). In Binette, the State presented only a police videotape of the defendant's driving; it did not present any live witnesses. See id. at 216. Thus, the de novo standard was appropriate. Id. at 217.

Appellant's case differs from Binette in that the trial court relied upon more than just the video evidence in making its factual findings and denying Appellant's motion. Here, the arresting officer *did* testify. Indeed, he testified about events that are *not* depicted in the video. That live, in-court testimony created issues of credibility for the trial court. Moreover, Officer Madison's testimony, which the trial court specifically accredited, was a critical component in its decision. The credibility issues take this case outside the purview of Binette. Therefore, we review the trial court's suppression decision under the deferential Odom standard. See State v. Brown, 294 S.W.3d 553, 561 (Tenn. 2009) (where the video evidence did not depict all of the pertinent events and where "the trial court's findings of fact

were also based on live testimony," the "de novo review does not apply"); see also State v. Garcia, 123 S.W.3d 335, 342-43 (Tenn. 2003).

Under Odom, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." 928 S.W.2d at 23. Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id.; see also State v. Mike Brotherton, No. W2007-02016-SC-R11-CD, __ S.W.3d __, 2010 WL 3733914, at *3 (Tenn. Sept. 27, 2010). Nevertheless, appellate courts will review both questions of law and the trial court's application of law to the facts purely de novo. See State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009); State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23; see also Brotherton, No. W2007-02016-SC-R11-CD, __ S.W.3d __, 2010 WL 3733914, at *3.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures."[2] Generally, a warrantless search is presumptively unreasonable and thus violates constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). Evidence derived from such a search is subject to suppression unless the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). One of the permissible exceptions is met when an officer temporarily seizes a citizen if the officer "has a reasonable suspicion, based upon specific and articulable facts, that a criminal offense has been, is being, or is about to be committed." Id. Thus, the question here is whether Officer Madison had a reasonable suspicion that Appellant was committing or had committed a crime. See Hanning, 296 S.W.3d at 49.

While it is not possible to precisely articulate what "reasonable suspicion" means, it is a "common sense, nontechnical conception" dealing "with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Keith, 978 S.W.2d at 867 (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). At a minimum, however, there must be more than an officer's mere "inchoate and unparticularized suspicion or hunch." Hanning, 296 S.W.3d at 49 (quotation marks omitted).

---

[2] In State v. Downey, our supreme court noted that "article I, section 7 is identical in intent and purpose with the Fourth Amendment." 945 S.W.2d 102, 106 (Tenn. 1997) (quotation marks omitted).

The analysis of whether an officer had reasonable suspicion is "a fact-intensive and objective analysis," which requires "reviewing the record for specific and articulable facts." Id. (quotation marks omitted); see also Brotherton, No. W2007-02016-SC-R11-CD, __ S.W.3d __, 2010 WL 3733914, at *3. In determining whether an officer had reasonable suspicion, "a court must consider the totality of the circumstances." Garcia, 123 S.W.3d at 344 (quoting Alabama v. White, 469 U.S. 325, 330 (1990)). "[R]easonable suspicion can be established with information that is different in quality or content than that required to establish probable cause and can arise from information that is less reliable than that required to show probable cause." Hanning, 296 S.W.3d at 49 (quotation marks omitted). It "does not require an actual violation of the law." Brotherton, No. W2007-02016-SC-R11-CD, __ S.W.3d __, 2010 WL 3733914, at *4. However, there must be "some minimal level of objective justification for making the stop." Keith, 978 S.W.2d at 867 (quoting United States v. Sokolow, 490 U.S. 1, 7-8, (1989)).

The record does not preponderate against the trial court's factual findings that underpinned Officer Madison's reasonable suspicion. Officer Madison testified that he saw Appellant "weaving over the lane lines" and that "each time" Appellant crossed the line, "it was [over] a considerable distance." As Office Madison explained, "[i]t wasn't like [Appellant] bounced over and then bounced back." Moreover, he testified that Appellant almost hit another car. Furthermore, Officer Madison specifically testified that much of what he saw, and much of what he testified about, was not depicted on the video because the view from the camera was obscured by other cars, the date stamp, and the winding nature of the road.

The trial court specifically accredited Officer Madison's testimony. In particular, the court credited Officer Madison's testimony "that he saw things . . . [that] may not have been on the videotape." The court explained that it did not "think that [the video] necessarily [showed] everything that the officer could have seen." As the court later noted at trial, "in order to sustain [Appellant's] position, [the court] would have to reject the officer's testimony," which the court found "no basis" for doing given its assessment of "the officer's demeanor and . . . voice." It simply could not "just reject out of hand what he has told the Court."

There is no dispute that if Officer Madison's testimony is accurate, he had a reasonable suspicion to believe that Appellant was violating Tennessee Code Annotated section 55-10-401 (driving under the influence) or had violated section 55-8-123 (failure to drive in a single lane). The question at this point is whether the video evidence so strongly contradicts Officer Madison's testimony as to make the record as a whole preponderate against the trial court's findings. We conclude that it does not.

Based on our close examination, the video neither confirms Officer Madison's testimony nor refutes it. The most obvious aspects of the video are that the camera's angle is fixed and the image it captures is obscured by a date stamp. In fact, the lane directly in front of Officer Madison's cruiser is covered by an "S" and a "2." The image is also slightly obscured by raindrops. As a result, the video does not clearly reflect Appellant's car's movements during the early moments of Officer Madison's pursuit. The video *does* reveal the road's topography, which Appellant contends disproves Officer Madison's testimony. In our view, the topography depicted in this video is not so extreme that we must discount Officer Madison's testimony that he saw things that were not on the screen. Quite simply, the video does not contradict Officer Madison's testimony that he repeatedly had a line of sight that the camera did not. We therefore reject Appellant's position that "the video shows that it would have been impossible for Officer Madison to have had a sight line good enough for him to observe specific and articulable facts" and that it "reveals Officer Madison was simply too far behind [Appellant's] car for him to even identify the car, much less observe specific and articulable facts about its movement." The video does not overcome Officer Madison's testimony and is not enough to demonstrate that the record preponderates against the trial court's findings of fact.

We observe from the record that the judgments of conviction reflect that the court sentenced Appellant to 6 months, to be served on probation, on count ten (failure to drive within a single lane of traffic in violation of Tennessee Code Annotated section 55-8-123) and count eleven (failure to provide evidence of financial responsibility in violation of Tennessee Code Annotated section 55-12-139). However, the transcript of the sentencing hearing reflects that the court ordered both sentences to be 30 days, to be served on probation. "This court has previously noted that when there is a discrepancy between what is reflected in the sentencing hearing transcript and what is on the judgment form, the transcript controls." State v. Adrian Porterfield, No. W2006-00169-CCA-R3-CD, 2007 WL 3005349, at *13 (Tenn. Crim. App. at Jackson, Oct. 15, 2007). In addition, the six-month sentence in the judgment for the violation of section 123 exceeds the statutory maximum. That violation is a class C misdemeanor, Tenn. Code Ann. § 55-8-103, and class C misdemeanors are punishable by a maximum sentence of thirty days "unless otherwise provided by statute," id. § 40-35-111(e)(3). Moreover, the sentence imposed for failure to provide proof of financial responsibility also exceeds the statutory maximum. Tennessee Code Annotated section 55-12-139(c) limits the punishment to a maximum find of $100. Both the judgment and the transcript order incarceration for the violation of section 139, but impose no fine. Therefore, the case must be remanded to the trial court for correction of the judgment in count ten (violation of Tennessee Code Annotated section 55-8-123) and for a hearing to determine the appropriate fine for count eleven (violation of Tennessee Code Annotated section 55-12-139). See State v. Charles Edward Graham, No. E2005-02937-CCA-R3-CD, 2008 WL 199851, at *16 (Tenn. Crim. App. at Knoxville, Jan. 24, 2008)

(remanding for correction of judgment after the trial court sentenced the defendant to thirty days in custody for violating section 139).

### III. Conclusion

Based upon our review, we conclude that this case should be remanded to the trial court for correction of the judgment on count ten and for correction of the judgment and a hearing to determine the appropriate fine on count eleven. The judgments are affirmed in all other respects.

_____
NORMA McGEE OGLE, JUDGE