# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 17, 2014 Session

## STATE OF TENNESSEE v. COREY M. WILLIS

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-CR067378    James G. Martin, III, Judge**

---

**No. M2014-00252-CCA-R3-CD - Filed October 27, 2014**

---

The defendant, Corey M. Willis, was charged with various driving under the influence (DUI) offenses. He filed a motion to suppress, alleging that the police lacked reasonable suspicion to perform the traffic stop. The trial court granted the motion, and the State appeals. Upon review, we affirm the trial court's ruling.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROGER A. PAGE, J., and LARRY J. WALLACE, SP. J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Kim R. Helper, District Attorney General; and Carlin C. Hess, Assistant District Attorney General, for the appellant, State of Tennessee.

Robert Wilson Jones and Henry Ambrose, Franklin, Tennessee, for the appellee, Corey M. Wilson.

## OPINION

## I.  Factual Background

On June 10, 2013, the defendant was charged by indictment with DUI; DUI, per se; and DUI, second offense. Subsequently, on October 22, 2013, the defendant filed a motion to suppress the evidence derived from the traffic stop, alleging that the police acted without reasonable suspicion.

At the suppression hearing, Laura Jackson testified that on January 28, 2013, she lived

at 345 Sliders Knob Avenue. Around 3:30 a.m., she was awakened by a loud noise and lights shining through her open bedroom window. She got out of bed, went to the window, looked outside, and saw a car driving "really fast." As Jackson watched, the car turned down the next road, German Lane. Jackson said that she called the police and told them that

> I had seen a car. He'd driven around the cul-de-sac several
> times, and it was a car that didn't look like it belonged in my
> neighborhood because it's a dead-end where I live – lived at that
> time. And he'd driven around several times and then he had
> turned down – he looked suspicious, what he was doing.
>
> . . . .
>
> . . . I told them that we'd had cars broken in to [sic], and that
> someone had recently broken in to [sic] someone's house. We'd
> had a number of issues, so I just wanted to make sure it was
> somebody who belonged in the neighborhood because they
> didn't look like they knew where they were going.

Jackson also told the police that she was a single mother and was concerned that "strange people" might be in her neighborhood.

On cross-examination, Jackson stated that she could tell by the way the lights were shining into her bedroom window that the car had driven around the cul-de-sac a couple of times. She thought the car was a sedan; however, because of the darkness, she could not discern any further details about the car.

Franklin Police Officer Tammy Lee Crowe testified that around 3:30 a.m. on January 28, 2013, she was advised by police dispatch that a complainant had reported an unusual vehicle in the area of Sliders Knob Avenue. She proceeded to the area to investigate, knowing that the area had a history of vehicle burglaries. When she arrived, she did not see any vehicles on Sliders Knob Avenue. After she turned onto German Lane, which was a "dead end" street, she saw a Toyota 4Runner sport utility vehicle (SUV) driving in a wooded area where there were no houses or roads. She had never seen a vehicle in that area on any previous occasion, so she found the vehicle's activity suspicious.

Officer Crowe began to pursue the SUV, but she became concerned that her patrol car could not "make it up into that area" because of the steep terrain. She stopped her vehicle and turned her spotlight on the SUV. She saw two subjects in the SUV and asked them to come to her patrol car. They complied, and Officer Crowe learned that the defendant was

-2-

the driver of the SUV.

On cross-examination, Officer Crowe said that when she spotted the SUV, its headlights and taillights were on, and the SUV was moving uphill. She turned her spotlight on the defendant's SUV, then she used her patrol car's public address (P.A.) system to ask the men to walk to her vehicle. When they arrived, she asked them to put their hands on the hood of her patrol car. She explained that she made the request because she was alone. Officer Crowe had the men keep their hands on the car until backup arrived on the scene. While waiting, she asked them who was driving and what they were doing in the woods. When backup arrived, the officers patted down the suspects to check for weapons. Officer Crowe did not handcuff the men, but she did have them sit in the back of her patrol car.

In response to questioning regarding why she thought a crime might have been committed, Officer Crowe responded, "[T]here was no residence back there. They could be trespassing and they could be the suspicious vehicle I was called to the scene to investigate." She said that the defendant told her they were in the area because his uncle had owned the property, and the defendant wanted to show it to his friend. The passenger said that the defendant was driving him home and that he did not know why they were in the area.

Officer Crowe said that the cul-de-sac had "curbing and there was a cut out to go into that wooded area, but there was not a road." The defendant had driven the SUV into the woods and up a hill, traveling approximately forty feet. The SUV stopped when Officer Crowe turned her spotlight on it. Officer Crowe said that her car was low to the ground and that she did not believe that it could make the drive into the woods and up the hill.

The State contended that Officer Crowe made a brief investigatory stop that was supported by reasonable suspicion that the appellant had or was about to commit a criminal offense. The State contended that the reasonable suspicion was based upon three facts: the information from a citizen informant, Jackson, about the SUV in the neighborhood; Jackson's information and Officer Crowe's own knowledge of recent burglaries in the neighborhood; and the lateness of the hour.

Defense counsel argued, and the State conceded, that the defendant was seized when Officer Crowe activated her spotlight and ordered the defendant to come to her vehicle. He further noted that no one saw a crime being committed and maintained that the facts cited by the State did not support reasonable suspicion. Defense counsel argued that Officer Crowe had, at best, a "inchoate and unparticularized suspicion or hunch" that someone had committed a crime.

The trial court specifically found that Jackson and Officer Crowe were credible. The

court stated:

> So what is or what are the specific and articulable facts in this case that would give rise to reasonable suspicion for Officer Crowe to make the stop? Well, you get a call from a concerned citizen who says that there's a loud noise. There have been prior burglaries in the neighborhood. The officer is aware that there are prior burglaries in the neighborhood. It's three o'clock in the morning. The time is certainly suspicious. The officer's familiar with the area. The defendant and the passenger are in an area where there are no homes. It's certainly an unusual circumstance to see them up there at three o'clock in the morning. . . . This is a close case in the Court's mind, and that's about the best I can tell you. The Court believes that, and the Court finds that Officer Crowe was doing what she should do at three o'clock in the morning on January the 28th, 2013. She was investigating what appeared to be very suspicious activity. But there are no – there are no specific and articulable facts here to cause her to believe a criminal offense had been or was about to be committed. . . . There's no evidence at that point in time that there's been any crime committed; none. There's no specific and articulable facts to believe that a crime was about to be committed. So on one hand, I do not fault Officer Crowe in any way for conducting her investigation and in making a determination that this neighborhood is safe. But on the other hand, . . . the Court finds that [the seizure] simply violates the Fourth Amendment and Article 1, Section 7 of our Constitution, so I grant the motion to suppress.

The State appealed the trial court's ruling,[1] arguing that Officer Crowe had reasonable suspicion to stop the defendant.

## II. Analysis

---

[1]After the trial court's ruling, the State initially requested and was granted the right to pursue an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Thereafter, the State determined that it could not go forward without the suppressed evidence. The trial court entered an order stating that the parties had agreed that the indictment would be dismissed and that the court's order granting the Rule 9 application would be stricken. The State then pursued the instant appeal.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against "unreasonable searches and seizures." In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009). However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed. State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). Our courts have thus articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted); see also State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

As we have noted, the State maintained that the stop was a brief investigatory stop supported by reasonable suspicion. The State conceded that the defendant was seized when Officer Crowe activated her spotlight and used her P.A. system to order the defendant and the passenger to come to her car. Analyzing "whether reasonable suspicion existed in a particular traffic stop is a fact-intensive and objective analysis." State v. Garcia, 123 S.W.3d 335, 344 (Tenn. 2003). In determining whether an officer had reasonable suspicion, "a court must consider the totality of the circumstances." Id.

"'[R]easonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.'" Keith, 978 S.W.2d at 866 (emphasis omitted) (quoting State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993)). Reasonable suspicion does not require "'proof of wrongdoing,'" but it does require some "'minimal level of objective justification for making the stop.'" Keith, 978 S.W.2d at 867 (quoting United States v. Sokolow, 490 U.S. 1, 7

(1989)). While impossible to precisely define, "reasonable suspicion" has been recognized as "'common sense, nontechnical conceptions'" dealing "'with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" Id. (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). However, an officer's "inchoate and unparticularized suspicion or hunch" is not sufficient reasonable suspicion. State v. Day, 263 S.W.3d 891, 907 (Tenn. 2008) (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)) (internal quotations omitted).

The trial court noted that the lateness of the hour, the presence of a strange vehicle in the area, and the appellant's presence on an unimproved piece of property were "unusual." Nevertheless, the trial court held that these facts did not establish reasonable suspicion to believe that a criminal offense had been or was about to be committed. The trial court noted that, in view of Moats, the State did not rely on the community caretaking function. The court also noted that the facts to support reasonable suspicion were weaker in the instant case than the facts in Moats.

Our supreme court has held that the lateness of the hour and the defendant's presence in a "high crime area" may be factors in determining reasonable suspicion; however, those factors alone do not establish reasonable suspicion. Moats, 403 S.W.3d at 179; see also State v. Lawson, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996). In the instant case, Jackson reported to the police that she was concerned about a strange car in her neighborhood because of recent burglaries; however, she did not report that she had witnessed any criminal behavior. Further, Officer Crowe did not observe the defendant engage in any criminal behavior. See Moats, 403 S.W.3d at 180. As the trial court aptly observed, "What you've got are two citizens riding around in a car at three o'clock in the morning in a quiet residential neighborhood, which is peculiar. But [peculiar] doesn't make it criminal." As our supreme court noted in Moats, the officer had the right to investigate further in a consensual manner; however, the officer did not have the right to seize the defendant based on a "'hunch'" that a criminal act might be afoot. We agree with the trial court and conclude that the trial court did not err by granting the defendant's motion to suppress.

### III.  Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

-6-