IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 26, 2016

**JESSICA MARIE MYERS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Greene County
No. 15CR008    John F. Dugger, Jr., Judge**

_____

**No. E2015-02037-CCA-R3-PC – Filed November 23, 2016**

_____

The Petitioner, Jessica Marie Myers, appeals from the Greene County Criminal Court's denial of her petition for post-conviction relief from her convictions for first degree murder and reckless endangerment, for which she is serving an effective life sentence. The Petitioner contends that the post-conviction court erred in denying relief on her ineffective assistance of counsel claims. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Jessica C. McAfee, Greeneville, Tennessee, for the appellant, Jessica Marie Myers.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; James B. (Jimmy) Dunn, District Attorney General; Cecil C. Mills, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's convictions relate to a burglary at the victims' home following an altercation between the Petitioner's then-boyfriend, who was the Petitioner's codefendant, and the victims regarding pills. During the burglary, Jimmy Cutshall was shot and killed, and Rhonda Cutshall was shot in the head but survived. The State proceeded on a criminal responsibility theory relative to the Petitioner's guilt. The jury found the Petitioner guilty of first degree premeditated murder and two counts of first degree felony murder for Mr. Cutshall's homicide, and reckless endangerment for Ms. Cutshall's shooting. This court affirmed the convictions but remanded the case for merger of the first degree murder convictions. *State v. Jessica M. Myers*, No. E2012-

01814-CCA-R3-CD, 2013 WL 5436955, at *1, 10-12 (Tenn. Crim. App. Sept. 27, 2013), *perm. app. denied* (Tenn. Feb. 12, 2014).

Codefendant Shawn Jones was tried before the Petitioner, was convicted of first degree murder, and was sentenced to life. *State v. Shawn Anthony Jones*, No. E2012-00480-CCA-R3-CD, 2013 WL 4041135, at *1 (Tenn. Crim. App. Aug. 9, 2013), *perm. app. denied* (Tenn. Jan. 15, 2014). A second codefendant, Chad Rader, who drove the Petitioner and Mr. Jones to the burglary but did not participate otherwise, pleaded guilty to an unspecified lesser offense after the Petitioner's trial.

The Petitioner filed the present post-conviction action and, as relevant to this appeal, alleged that trial counsel had provided ineffective assistance in failing to (1) address the DNA evidence adequately, (2) file a motion to suppress the Petitioner's pretrial statement, (3) raise issues in the previous appeal, and (4) raise a motion to dismiss in a timely manner.

At the post-conviction hearing, trial counsel testified that he learned about the existence of evidence consisting of a fingernail inside a glove shortly before he met with the prosecutor to request a plea offer for second degree murder in exchange for the Petitioner's testimony against her codefendant. Counsel said the prosecutor stated that no offers would be made. Counsel said that he did not file a motion to suppress the fingernail and glove evidence but that he took the position during the plea discussion with the prosecutor and during his cross-examination of the State's forensic witnesses about the State's inability to associate the fingernail and glove with a specific time or place. He said the fingernail and glove evidence was the only forensic proof tying the Petitioner to the crimes but did not think it was the "big reason" the Petitioner was convicted. He said he and the Petitioner discussed this evidence. Although counsel did not specifically recall having done so, he said he was "sure" he had questioned the State's expert about the significance of the presence of DNA from three individuals on the glove. He agreed that the fingernail analysis showed the Petitioner's DNA and that the glove analysis showed the codefendant's and Rhonda Cutshall's DNA.

Trial counsel agreed that a large bag of clothing was recovered from the codefendant's house. He agreed that most of the clothing items were tested for DNA evidence. He said he raised in closing argument the possibility that cross-contamination had occurred. He noted that a Tennessee Bureau of Investigation (TBI) agent admitted that cross-contamination could occur. He agreed that in view of the evidence of possible cross-contamination, he did not think it was necessary to request expert funding for independent DNA testing. He did not recall whether any evidence was presented to show which individuals owned various items of clothing from the bag.

-2-

Trial counsel testified that his defense focused on showing that the Petitioner had not been the shooter and that she had been a victim of a "brute," referring to the codefendant. He said he had hoped the evidence of the codefendant's aggressiveness could be used to show "battered woman syndrome" such that the Petitioner had been forced to participate in the offenses and did not have the intent to commit murder or the predicate felonies of the felony murder counts. He said that he contacted a psychiatrist with whom he had worked previously and who he thought was "the best in the state," that the psychiatrist agreed to work for court-appointed rates, and that the psychiatrist met with the Petitioner. Counsel said that after the meeting, the psychiatrist informed him that in the psychiatrist's opinion, the Petitioner did not have battered woman syndrome or post-traumatic stress disorder. Counsel said that he asked the court for funds to hire a second psychiatrist to serve as a defense expert but that the court denied the request. Counsel asked the Petitioner's father to provide the expert funds, but the father did not.

Trial counsel testified that despite the lack of expert assistance, he presented a battered woman defense through testimony of the Petitioner's family members and a former police officer who had arrested the codefendant and had seen the Petitioner's bruises. Counsel noted that the evidence of the Petitioner's participation was limited to her "kicking down [the] door," and counsel said the proof showed the Petitioner twice kicked and tried to get away from the codefendant but that the codefendant had run after the Petitioner and forced her to participate.

Trial counsel testified that he filed a motion requesting that the State be prohibited "from referring to any evidence that [the Petitioner] was the trigger puller" because the State had offered evidence at a previous trial that the codefendant had pulled the trigger, but he said the trial court denied his motion. Counsel said, however, that he argued the Petitioner was less culpable than others who may have been involved in the crime.

Trial counsel testified that the Petitioner gave three statements to law enforcement before counsel was appointed. He noted that she had given a statement, that she had been incarcerated, and that she had sent two requests to talk with the police again while she was incarcerated. He also noted that a trial court's ruling on a denial of a motion to suppress would not be reversed absent abuse of discretion and said he had not raised the court's denial of the motion to suppress in the appeal because he did not think relief would be granted. He acknowledged that the Petitioner and two other individuals gave incriminating statements.

Trial counsel acknowledged that he did not meet with the Petitioner, who was incarcerated in the Department of Correction, before filing the appellate brief. Counsel said, however, that he always provided his clients with a copy of the filed appellate brief.

He said he did not raise an appellate issue regarding the trial court's denial of funding for a second defense expert because he thought the ruling was within the trial court's discretion.

Trial counsel acknowledged that Codefendant Jones's family, particularly his grandmother, "raised a stink" because they thought the Petitioner was "some sort of evil woman or something like that." Counsel said, however, that the codefendant's family's feelings were unrelated to the State's decision not to extend a plea offer to the Petitioner. Counsel said that if the State had made an offer, he would have communicated it to the Petitioner, without regard to whether he thought the offer was favorable to the Petitioner.

Trial counsel testified that early in the case, he noticed a defect in the indictment because the "true bill" box had not been checked. He said he was aware of Tennessee Rule of Criminal Procedure 12(b)(2)(B), which stated that generally, an allegation regarding a defective indictment must be raised before the trial. He noted, however, that the rule also stated that the court could hear a claim at any time if the indictment failed to show jurisdiction or failed to charge an offense. He said that he decided to wait to raise the issue in the motion for judgment of acquittal because jeopardy attached when the jury had been sworn but that the trial judge noticed the defect before the motion for judgment of acquittal. He said he had not raised the issue earlier because he did not want to give the State the opportunity to cure the defect. Counsel said the court called the grand jury foreperson as a witness to remedy the defect. He said that notwithstanding the grand jury foreperson's testimony, he made a motion to dismiss for lack of jurisdiction, which the court denied. Counsel said that the appellate courts had ruled repeatedly that the motion had to be raised before the trial and that this court held accordingly in the Petitioner's case. He noted, however, that this court merged the Petitioner's murder convictions into a single count. He said that the merger foreclosed the opportunity to raise the issue regarding the deficiency of the indictment in the Tennessee Supreme Court.

Trial counsel testified that he did not raise an appellate issue regarding jury sequestration because the jury pool came from another county. He said that he considered the choice not to request a sequestered jury to be a matter of trial strategy and that he had been concerned about the jurors developing a "mob mentality" if they were sequestered. He said that although he had filed a motion to sequester the jury in the trial court, he did not argue the motion. He said he had discussed the strategy relative to the sequestration issue with the Petitioner.

The Petitioner testified that she had faced the death penalty in the conviction proceedings and that the State would be able to seek the death penalty if she were granted post-conviction relief. She said that although the jury was chosen from Hamblen County

for her Greene County trial, she thought the jury should have been selected from a more distant county that had not had media coverage of the case. She said a jail inmate from another county had been aware of her case due to media coverage in the inmate's home county. She also said that a person who lived in Johnson City had seen media coverage of her case. She thought the jury should have been sequestered to prevent their accessing social media during the trial but acknowledged she never voiced any concern to trial counsel during the trial. She denied that she and counsel discussed the danger of a "mob mentality" if the jury were sequestered but acknowledged they discussed the possibility that sequestered jurors might discuss the case and convince one another of things that would be harmful to the defense. She acknowledged that a sequestered jury might "cut both ways."

The Petitioner testified that trial counsel did not ask a forensic expert to explain the meaning of "degraded DNA." She thought the existence of degradation would indicate the DNA had been present for more than three or four days. She thought counsel's failure to ask questions about degraded DNA hurt the defense "[b]ecause [the jurors] see that as my fingernail in the glove and that was the glove that was used in the shooting." She acknowledged that the glove contained DNA from herself, Codefendant Jones, and the female victim. The Petitioner did not recall whether counsel questioned her during her trial testimony about how many times she had worn the gloves. She said she had told counsel that she had worn the gloves and other unspecified items when hunting. She did not recall whether counsel mentioned in closing argument the possibility she had worn the gloves on other occasions.

The Petitioner testified that in her opinion, trial counsel should have filed a motion to suppress the fingernail and glove evidence because this evidence contained degraded DNA. She did not recall whether she and counsel discussed the possibility of having the evidence suppressed. She thought that if the jury did not understand what degraded DNA meant, it might have convicted her solely on the basis of this evidence.

The Petitioner agreed that the bag of clothing contained both her and Codefendant Jones's clothing. She agreed that the laboratory report specified which items of clothing contained DNA evidence and that traces of the victims' blood was identified on some of the clothing. She said she had advised trial counsel of the clothing items she wore but that he had not presented the evidence at the trial. She said that the only blood on her clothing was a spot on a pair of pants, that the stain "could not be localized," and that no DNA could be identified. She said that Codefendant Jones's clothing contained blood "splatter" and that hers did not. Nevertheless, she said, the jury was not informed of which clothing was hers and which was Codefendant Jones's.

The Petitioner testified that she, not trial counsel, found the defect in the indictment and that she brought it to his attention. She said counsel stated he could try to get the case dismissed and that it might go back in front of the grand jury. She acknowledged that the court noted the defect before counsel mentioned it at the trial.

The Petitioner acknowledged that trial counsel filed a motion to suppress her pretrial statements. After reviewing a copy of the appellate brief, she stated that the suppression and change of venue issues had not been raised on appeal and that she thought they should have been raised. She said she had been unable to talk to counsel regarding the issues to be raised on appeal and agreed that counsel chose the issues.

The Petitioner testified that she had not heard about the defense's consulting psychiatrist's findings until the day of the post-conviction hearing. She said, however, that trial counsel had advised her that the psychiatrist did not find "PTSD or . . . battered wife" syndrome and that there was no reason to call the psychiatrist as an expert. The Petitioner acknowledged that counsel mentioned he had tried to obtain funds for a second defense psychiatric evaluation and that counsel attempted to obtain funds for the second evaluation from the Petitioner's father. She said her father was unable to provide the funds. She said she and counsel discussed how the lack of a defense psychiatric expert could harm the defense. She said her father could testify to the abuse she suffered from Codefendant Jones. She noted the defense psychiatrist talked to her about three years after the offense and stated that at this point, she did not have to worry about Codefendant Jones.

The Petitioner testified that she and trial counsel discussed the facts surrounding the offense. She said that she and Codefendant Jones had argued that night, that she "did not want to go," and that she could not have overpowered Mr. Jones, particularly when he had a gun. She said that she had not understood the concept of felony murder but that counsel had explained "first degree murder" and felony murder to her. She said they discussed the fact that she could be found guilty of felony murder even if she were not the "main person that does it." She said counsel explained burglary to her and acknowledged that the State presented sufficient evidence for the jury to convict her of burglary. She agreed that she had kicked the door of the victims' home and that the female victim's property was found in "our" possession. She said she told counsel that Codefendant Jones wanted her to kick in the door, that she kicked the door, that it did not open, and that Codefendant Jones kicked open the door. She said counsel explained that although she had not been successful, she had attempted and admitted her involvement. She agreed that she had hoped to convince the jury that her participation had not been her idea and that she had not known Codefendant Jones was going to commit the shootings. She acknowledged that Codefendant Jones had mentioned that he wanted to rob Mr.

Cutshall. She said Codefendant Jones had put the gloves and mask on her. She said she kicked him twice trying to get away from him.

When asked how she thought trial counsel's actions and inactions had contributed to her guilty verdicts, the Petitioner testified, "I think the jury didn't completely understand certain evidence, certain things, he could have explained in a little more detail." When asked to explain why counsel's actions and inactions affected the verdict, she said she thought the "jury . . . would have seen the evidence in a different light instead of two trigger people."

The Petitioner testified that trial counsel did not "bring [an] offer to" her. She said he told her at one point that there had been an offer but that it had been revoked because Codefendant Jones's grandparents objected to the district attorney's not extending an offer to Codefendant Jones while making plea offers to her and Codefendant Rader. She said counsel did not tell her the terms of the withdrawn offer. She said that before counsel told her about the withdrawn offer, she and counsel had discussed plea offers she would be willing to accept, which she said included facilitation of an unspecified offense or "second degree." She said she did not ask how long the offer had been available. She said Codefendant Rader pleaded guilty after her trial.

The Petitioner testified that she told trial counsel about her concern that a juror knew Jennifer Paxton, a jail employee. She said counsel shook his head and did not think it was "such a big deal." She agreed that she did not tell counsel to remove the juror on this basis. She said that she and counsel had no discussion about challenging a juror whose business had been burglarized but that counsel should have challenged the juror. She agreed she left picking the jury to counsel. She thought that these jurors might have been biased in favor of law enforcement and that it might have affected her trial.

The Petitioner acknowledged that she liked trial counsel and that they talked at length about her case. She said she trusted him. She said she never asked the trial court to remove counsel as her attorney.

Charlsey Anderson, Codefendant Jones's grandmother, testified that she had talked to an assistant district attorney general about the case but that she was unaware of whether the State made any plea offers to the Petitioner. She denied that she told the Petitioner's counsel previously that multiple offers were made to the Petitioner and Codefendant Rader. She did not recall having gone to the district attorney general's office when she was upset because she thought the State was going to enter into a plea agreement with the Petitioner but acknowledged she "said it on the phone." She maintained, however, that she did not know whether the State made a plea offer to the

Petitioner. When asked if she and her husband went to the district attorney general's office to complain about the State being "nice" and "too easy on" the Petitioner, she responded, "No, I didn't say they was [sic] too easy on her."

Joseph Fred Myers, Jr., the Petitioner's father, testified that at some point, trial counsel told him in person that a plea "deal" might be "in the works" for the Petitioner and Codefendant Rader. Mr. Myers said, however, that he never heard the terms of the deal. He said counsel advised him in a subsequent telephone conversation that Codefendant Jones's grandparents had objected to the Petitioner's receiving a plea offer because Codefendant Jones had been tried and wanted the Petitioner to face a trial, as well. Mr. Myers agreed that it was his understanding the grandparents' objection was the reason a plea offer was taken "off the table." He was unaware whether counsel ever advised the Petitioner of a plea offer.

The post-conviction court denied relief in a written order. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services

-8-

rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

# I

## Failure to Address DNA Evidence Adequately

The Petitioner contends that trial counsel provided ineffective assistance by failing to address adequately certain matters related to the DNA evidence. Relative to the glove and fingernail evidence, she contends that counsel should have lessened its harmful impact by questioning the State's forensic expert about the amount of time the DNA evidence had been on the glove and questioned the Petitioner about the possibility her fingernail had been left in the glove before the crimes occurred. She argues, alternatively, that counsel should have filed a motion to suppress the glove and fingernail evidence. She also argues that counsel should have asked her to identify which items of clothing from a bag recovered at Codefendant Jones's house were hers. The State contends that the post-conviction court correctly denied relief. We agree with the State.

The trial proof showed that on the day after the crime, a bag containing several articles of clothing was collected during a police search of Codefendant Jones's house. The house had been searched by the police the previous day, but the bag of clothing had not been present at that time. The bag contained a glove, and a fingernail was discovered inside the glove when it was examined by the TBI. Forensic analysis revealed the presence of DNA from three individuals, and the testing did not exclude the Petitioner, Codefendant Jones, and one of the victims as its contributors. Testing revealed that the fingernail was the Petitioner's. By the Petitioner's own admission, she wore gloves during the crimes, although she claimed codefendant Jones placed them on her forcibly. *Jessica M. Myers*, 2013 WL 5436955, at *4, 6-7.

-9-

## A. Glove and Fingernail Evidence

### 1. Examination of Witnesses

The trial record, which was received as an exhibit at the post-conviction hearing, reflects that trial counsel did not ask the Petitioner about other occasions on which she wore the glove. It reflects, however, that at the end of redirect examination, counsel asked the Petitioner if she shot the victims, and she responded that she had not. It likewise reflects that counsel's cross-examination of the State's serology DNA expert focused on the expert's lack of ability to identify when the fingernail was left in the glove. During cross-examination, the expert stated that he had no basis for determining how "old" the fingernail was. He also said that testing would not establish the timeframe within which DNA had been left on an object.

Relative to this issue, the post-conviction court noted in its order denying relief that the Petitioner gave three incriminating statements to law enforcement, that her testimony placed her at the crime scene, and that she had attempted unsuccessfully to kick in the door. The court found that the Petitioner's fingernail merely corroborated her presence at the scene and determined that the Petitioner failed to carry her burden of proving her claim by clear and convincing evidence.

Trial counsel elicited the Petitioner's testimony that she did not shoot the victims. She admitted in her testimony that she had been present, and she acknowledged at the post-conviction hearing that she knew Codefendant Jones wanted to steal pills from the victims' home and that she kicked the door at Codefendant Jones's insistence. Questioning the Petitioner about other times she may have worn the glove would not have diminished the incriminating nature of the facts. The State's expert testified on cross-examination that the testing which had been performed would not establish when the fingernail was left inside the glove or when DNA was deposited on the glove. The Petitioner failed to carry her burden of establishing deficient performance by counsel and prejudice from counsel's actions. The post-conviction court did not err in denying relief on this basis.

### 2. Suppression

The Petitioner also contends that trial counsel provided ineffective assistance because he failed to file a motion to suppress the fingernail and glove evidence as unduly prejudicial. She bases this argument upon her own opinion expressed in her post-conviction testimony that a laboratory report showing "degraded" DNA on the glove indicated that the material had been on the glove for some time. The Petitioner did not offer expert proof at the post-conviction hearing to support her claim that the conclusion

to be drawn from degraded DNA was that it had been present for some time. As we have noted, the State's serology DNA expert testified at the trial that the testing performed did not establish how long the DNA had been present on the glove and that he could not offer an opinion regarding how long the fingernail had been in the glove. The Petitioner has not provided any citation to authority to support her claim that this evidence should have been suppressed as unduly prejudicial. We note that Tennessee Rule of Evidence 403 provides for exclusion of relevant evidence if its probative value is outweighed by the danger of unfair prejudice. This is an evidentiary matter, in contrast to suppression of evidence, which generally addresses constitutional concerns. *See, e.g.*, *State v. Meeks*, 262 S.W.3d 710 (Tenn. 2008) (addressing constitutionality of a warrantless search); *State v. Garcia*, 123 S.W.3d 335 (Tenn. 2003) (addressing constitutionality of a vehicle stop and whether consensual search of vehicle was sufficiently attenuated from an unlawful detention); *State v. Binette*, 33 S.W.3d 215 (Tenn. 2000) (addressing constitutionality of a warrantless traffic stop). The Petitioner has not articulated a constitutional basis for suppressing the evidence. The Petitioner failed to carry her burden of establishing deficient performance by counsel and prejudice from counsel's actions. The post-conviction court did not err in denying relief on this basis.

## B. DNA Evidence on Clothing

The Petitioner contends that trial counsel provided ineffective assistance because he failed to ask her to identify which items of clothing from the bag recovered at Codefendant Jones's house were hers. She argues that this evidence could have assisted the jury in determining her credibility about her version of events and whether she was the shooter. The State contends that because it relied on a criminal responsibility theory at the trial, the identity of the shooter was irrelevant in view of the Petitioner's admission she was with codefendant Jones and that she kicked the victims' door.

At the post-conviction hearing, the Petitioner did not testify about which items of clothing were hers. Without this evidence, the post-conviction court was without a basis for determining how it might have corroborated the Petitioner's testimony and demonstrated that she was not the shooter. As the State notes, it relied upon a criminal responsibility theory as to the Petitioner, and she admitted her presence and participation in the offenses in her pretrial statements and testimony. The Petitioner failed to carry her burden of establishing deficient performance by counsel and prejudice from counsel's actions. The post-conviction court did not err in denying relief on this basis.

-11-

## II

## Failure to File Motion to Suppress Petitioner's Pretrial Statements

The Petitioner contends that trial counsel provided ineffective assistance by failing to file a motion to suppress her pretrial statements based upon her impairment from Xanax ingestion and the fact that she was "scared, confused, and pressured into giving statements." The State contends that the Petitioner did not establish ineffective assistance because the evidence shows that her statements were given upon her request to speak to officers.

This issue was not raised in the pro se or amended post-conviction petitions. The amended petition alleged that trial counsel provided ineffective assistance by failing to raise an appellate issue regarding the propriety of the trial court's ruling on the Petitioner's "motion to suppress statements in violation of her right against self-incrimination, or because it was taken under circumstances highly likely to show duress, coercion, or undue influence." In fact, the trial record reflects that counsel filed a motion to suppress a pretrial statement made by the Petitioner, albeit on the basis the statement had been made after she requested an attorney. The post-conviction court was not asked to, and did not, address an allegation of ineffective assistance of counsel due to the failure to file a motion to suppress the Petitioner's pretrial statements. Consideration of this issue is waived. *See, e.g.*, *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. 2004) ("[A]n issue raised for the first time on appeal is waived.").

## III

## Failure To Raise Appellate Issues

The Petitioner contends that trial counsel provided ineffective assistance by failing to raise appellate issues regarding (1) a motion to suppress the Petitioner's pretrial statements and the DNA evidence, (2) a motion for a change of venue, and (3) the DNA results as impacting the sufficiency of the evidence. The State contends that the post-conviction court did not err in denying relief because the evidence showed that counsel relied upon his professional judgment in choosing the issues to raise in the appeal.

The Petitioner's complaint relates, in part, to trial counsel's failure to consult with the Petitioner about the issues to be raised in the appellate brief. She has not identified, however, any information or input she had which would have affected counsel's decisions about the issues to be raised. Likewise, she has not cited authority to show that she was entitled to relief on the issues she complains counsel did not raise. She

-12-

complains, "The likelihood of a remand, or new trial, was . . . limited [by counsel's failure to raise additional issues] and entirely based upon the issues presented in the appellate brief. So, counsel should have explored all options for reversal, not just the limited issue(s) he presented." Trial counsel's testimony reflects that he considered the issues and raised the ones he thought held the possibility for appellate relief. His testimony reflects that he did not raise issues for which he thought the possibility of relief did not exist. Counsel is "not required to raise every conceivable issue on appeal." *See, e.g.*, *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). As a general principle, the decisions regarding which issues to be raised on appeal are within counsel's sound discretion. *See id.* The post-conviction court did not err in determining that the Petitioner failed to carry her burden of proving that counsel's performance was deficient and that she was prejudiced by his actions and inactions. The court did not err in denying relief on this basis.

## IV

## Failure to Make a Timely Motion to Dismiss

The Petitioner contends that trial counsel provided ineffective assistance because he failed to make a timely motion to dismiss Count 1 of the indictment, which the record reflects charged first degree premeditated murder, based upon the "true bill" box not being checked. The State contends that counsel elected to wait until jeopardy attached in order to foreclose the State from remedying the defect, and that in any event, the Petitioner cannot show prejudice because if counsel had made the motion in the time specified by the Rules of Criminal Procedure, the State would have corrected the error.

Trial counsel testified at the post-conviction hearing that he was aware of the defect in Count 1. He said that he was aware, as well, that Tennessee Rule of Criminal Procedure 12(b)(2)(B) provided that generally, an allegation regarding a defective indictment must be raised before the trial. He noted, though, that the rule also stated that the court could hear a claim at any time if the indictment failed to show jurisdiction or failed to charge an offense. Counsel elected to wait to raise the issue and planned to do so in the motion for judgment of acquittal because jeopardy attached when the jury had been sworn. According to the proof at the post-conviction hearing, the trial judge noticed the defect before a motion for judgment of acquittal was made. Counsel said he had not raised the issue earlier because he did not want to give the State the opportunity to cure the defect.

The trial transcript reflects that during the State's case-in-chief, the following transpired:

-13-

THE COURT: Something that has arisen about this trial, and it has just come to my attention inadvertently that I was sitting up here and opened the file, and I don't think any of the lawyers have caught it yet. I don't think –

[TRIAL COUNSEL]: I think I have, your Honor; I was going to make it, it's the fact that count one of the indictment does not checked [sic] a true bill or a no true bill; is that right?

The court noted that no defect existed as to the remaining counts of the indictment. The court called the grand jury foreperson, who testified that Count 1 was a true bill and that he had failed to check its status as such on the indictment. Counsel made a motion to dismiss the indictment on the basis that jeopardy had attached, although acknowledging that the State still had felony murder charges pending against the Petitioner. The court denied the motion and ruled that the State could proceed on Count 1.

Trial counsel challenged the trial court's ruling in the previous appeal. In determining that the Petitioner was not entitled to relief, this court examined relevant cases and said, "It would appear, based on the cases cited and the dicta in [*State v. Applewhite*, 597 S.W.2d 328 (Tenn. Crim. App. 1979)], that the error is not jurisdictional and was therefore waived when the defendant failed to raise it prior to trial." *Jessica M. Myers*, 2013 WL 5436955, at *14. The court went on to conclude that even if the failure to check the "true bill" box on the indictment was jurisdictional, could not be waived, and invalidated the first degree premeditated murder conviction, any error was harmless in view of the felony murder conviction. *Id.* In a footnote, the court acknowledged the trial court's attempt to cure the defect that occurred in this case and stated that due to the Petitioner's inability to obtain relief, it would not address the effect of the trial court's effort to cure the defect. *Id.* at *14 n.7. This court also directed the trial court to merge the conviction for Count 1 with the convictions for felony murder. *Id.* at *14.

In evaluating trial counsel's conduct, we note that this court acknowledged the lack of clarity in the existing caselaw and an ambiguity in the statute regarding the requirements for a determining what constitutes the finding of a true bill. *See id.* at *13. The Petitioner has cited no authority other than the opinion in her previous appeal and the relevant Rule of Criminal Procedure to support her position that counsel's performance was deficient. We note that had counsel pursued a motion to dismiss before the trial, the State would not have been foreclosed from returning to the grand jury to seek a new indictment. We cannot conclude that the evidence preponderates against the post-conviction court's determination that counsel did not perform deficiently. In any event,

-14-

dismissal of Count 1, charging first degree premeditated murder, would have availed the Petitioner no benefit because no issue existed with regard to the counts charging felony murder. Ultimately, the Petitioner was convicted of the felony murder counts, which were merged with Count 1. We conclude, therefore, that the trial court did not err in determining that the Petitioner failed to prove that she received ineffective assistance of counsel in this regard. She is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE